Christopher SELLETTI, Plaintiff,

v.

Mariah CAREY, Sony Music Entertainment, Inc., Sony Songs, Inc., Sony Music Publishing, Wallyworld Music, Rye Songs, WB Music Corporation, Columbia Records, Inc., Sylvester Stewart, p/k/a Sly Stone, Even Street Productions, Ltd., Jerry Goldstein, individually and as President of Even Street Productions, Ltd., Avenue Records, American Society of Composers, Authors & Publishers (ASCAP), Broadcast Music, Inc. (BMI), Steve Toppley and Ruby Jones, Defendants.

No. 96 CIV. 0016(DC).

United States District Court,
S.D. New York.

Jan. 20, 1998.

Ross M. Gadye, New York City, for Plaintiff.

Parcher, Hayes & Liebman, P.C. by Jonathan Liebman, Orin Snyder, New York City, for Defendants.

### *MEMORANDUM DECISION*

CHIN, District Judge.

On June 26, 1997, I issued an order dismissing this action with prejudice because plaintiff Christopher Selletti had failed to pay a discovery sanction and post a bond as required by my opinion and order of May 21, 1997. *See Selletti v. Carey,* 173 F.R.D. 96 (S.D.N.Y. May 21, 1997). Thereafter, Selletti's new attorney, Ross M. Gadye, Esq., wrote a letter asking the Court to vacate the order of dismissal. I treated the request as a motion pursuant to Fed. R. Civ. 60(b) to vacate a "final judgment, order, or proceeding" and I denied the motion by memorandum decision dated July 25, 1997. *See Selletti v. Carey,* 174 F.R.D. 311 (S.D.N.Y. July 25, 1997).

Selletti failed to move for reargument or reconsideration of my July 25, 1997 decision. Likewise, he failed to appeal. Rather, he waited some four months and then filed, on November 19, 1997, a formal motion pursuant to Rule 60(b) for an order "relieving Plaintiff from the Order dismissing the within action." The motion was filed on Selletti's behalf by Gadye.

After receiving Selletti's motion, I conferenced the case on December 9, 1997. A briefing schedule was set. At the conclusion of the conference, I asked to see a copy of plaintiff's "poem," that is, the "poem" that he purportedly wrote that purportedly became the lyrics to Mariah Carey's song *Hero.* Neither Selletti nor his attorney had a copy, but a copy was provided to the Court a few days later.[1] Defendants also submitted a copy of the lyrics to the Carey song as released.

---

1. Surprisingly, plaintiff's purported lyrics had     not previously been submitted to the Court.

Upon comparing plaintiff's "poem" to the lyrics, I saw that they were virtually identical. With the exception of just a few words, one is a verbatim copy of the other. Yet, Selletti was representing to the Court that he authored the lyrics himself in 1989, while defendants were representing that Mariah Carey co-authored the song with Walter Afanasieff sometime in 1992.

In view of these circumstances, I was concerned that someone was seeking to commit a fraud on the Court. Either Selletti was outright fabricating the allegation that defendants had misappropriated his "poem," or defendants were misrepresenting to the Court that the song had been written by Carey and Afanasieff. Consequently, I conducted a hearing on December 18, 1997.

At the hearing, Selletti testified and was examined by the Court, defendants' counsel, and Gadye. Defendants' counsel also played two "writing tapes," *i.e.*, tape recordings of two sessions of Carey and Afanasieff working on the song, with Afanasieff playing the piano, Carey singing and humming, and both talking from time to time. Defendants' counsel also provided a "writing book" that Mariah Carey had kept when writing *Hero* as well as other songs. Defendants' counsel also played a video tape of an interview of Selletti and his prior attorneys filmed in approximately May 1996. Finally, defendants' counsel provided a videotape of the 1992 movie *Hero,* which starred Dustin Hoffman, Geena Davis, and Andy Garcia.

After having considered the evidence, I conclude that Selletti's second Rule 60(b) motion must be denied, for two reasons. First, the motion is untimely. If Selletti was going to seek relief from the order of dismissal, he was obliged to do so either by moving for reargument or reconsideration or by filing an appeal. He did neither. He cannot now circumvent the applicable time limits by filing a second Rule 60(b) motion. Second, after having had an opportunity to assess Selletti's credibility, I am firmly convinced that he is not being truthful. To the contrary, I conclude that his allegations are a complete fabrication.

## BACKGROUND

Mariah Carey released the song *Hero* in 1993 as part of her *Music Box* album. Both the song and the album were hugely successful. The album achieved multi-platinum status and the song, released as a single, remained in the "Top Ten" for weeks.

The lyrics of Carey's *Hero* are as follows:

There's a hero If you look inside your heart You don't have to be afraid Of what you are There's an answer If you reach into your soul And the sorrow that you know Will melt away

And then a hero comes along With the strength to carry on And you cast your fears aside And you know you can survive So when you feel like hope is gone Look inside you and be strong And you'll finally see the truth That a hero lies in you

It's a long road When you face the world alone No one reaches out a hand For you to hold You can find love If you search within yourself And the emptiness you felt Will disappear

[chorus]

Lord knows Dreams are hard to follow But don't let anyone Tear them away Hold on There will be tomorrow In time You'll find the way

[chorus]

Selletti, represented by Thomas F. Liotti, Esq., commenced this action on January 2, 1996. In his complaint, Selletti alleged that he had written a "poem" in 1989 and that certain of the defendants "appropriate[d]" the poem without his "knowledge or consent." (Compl. ¶¶ 2, 8). Referring to the poem as the "SUBJECT WORK," the complaint alleges:

8. Upon information and belief, defendants RUBY, STONE, TOPPLEY, EVEN STREET, AVENUE RECORDS and GOLDSTEIN, acting collectively and in

---

Plaintiff attached to his November 18, 1997 affidavit what he described as "all of my lyrics, ... 217 pages of lyrics." (Selletti 11/18/97 Aff. ¶ 11).

Yet, the very lyrics that were the subject of this suit were not included, and the Court had to request them separately. (*See* 12/9/97 Tr. 10–11).

concert, arranged to appropriate copies of the SUBJECT WORK from PLAINTIFF'S notebook without PLAINTIFF's knowledge or consent.

The complaint further alleges that Carey "knowingly and willfully directly copied" Selletti's poem "in its entirety," and that Carey's claim that she authored the song *Hero* is "fraudulent[]." (Compl.¶ 10).

Notwithstanding these serious allegations, Selletti failed to prosecute this case diligently. As detailed in my prior decisions, he and Liotti failed to comply with discovery obligations and ignored orders of the Court. For example, although Selletti and Liotti provided the media with an interview and a copy of Selletti's "poem," they refused (until late in the proceedings) to produce a copy of the "poem" in discovery in this case. *See Selletti*, 174 F.R.D. at 314–15; *Selletti*, 173 F.R.D. at 98–100.

As a consequence of the failures of Selletti and his prior counsel, I imposed a discovery sanction on Selletti of $5,000 and I also required that he post security pursuant to Local Civil Rule 54.2 in the amount of $50,000.

Still represented by Liotti, Selletti moved for reargument by seeking an order to show cause. For the reasons stated on the record on June 4, 1997, I denied both the application for an order to show cause and the underlying request for reargument.

Thereafter, I received correspondence from both Liotti and Gadye, each purporting to be writing on Selletti's behalf. Liotti wrote to the Court on June 16, 1997. Just four days letter, although no substitution of counsel had been requested, Gadye wrote a letter to the Court stating that he had been consulted by Selletti about the lawsuit and was writing on his behalf. On June 24, 1996, just four days later again, I received yet another letter from Liotti, again purportedly on Selletti's behalf.

On June 26, 1997, because Selletti had failed to pay the $5,000 sanction and had also failed to post the $50,000 security, I dismissed the case with prejudice. In my order, I wrote that "[i]f . . . Selletti is willing to promptly post a bond and pay the discovery sanction, his counsel should advise me of that

fact in writing within three business days and I will consider vacating the order of dismissal." (Order of Dismissal at 3–4).

I did not hear from Selletti or his counsel within three business days. Rather, on July 16, 1997, nearly three weeks later, Gadye wrote to the Court on behalf of Selletti requesting that the amount of the bond be lowered and asking for the order of dismissal to be vacated.

I denied both requests in my memorandum decision of July 25, 1997. *Selletti*, 174 F.R.D. at 311. In doing so, I treated Selletti's request as a Rule 60(b)(1) motion to vacate an order or judgment for "mistake, inadvertence, surprise, or excusable neglect." In particular, I considered whether Selletti's prior counsel's poor handling of the case was a basis for vacating the dismissal. I also considered the five factors that a court should weigh in considering whether to dismiss a case pursuant to Fed.R.Civ.P. 41(b) and Local Civil Rule 54.2. 174 F.R.D. at 313–15.

As noted, I heard nothing further about this case until almost four months later, when the instant motion was filed on November 19, 1997. Accompanying the motion was an affidavit submitted by Selletti in which he made serious allegations about his prior counsel. Indeed, in his affidavit Selletti alleged that Liotti had been "neglectful in all the proceedings of this case," that Liotti "stands alone in his fraudulent actions," and that Liotti's conduct "amounted to gross malfeasance and fraud." (Selletti 11/18/97 Aff. ¶¶ 14, 17). Selletti also complained in his affidavit that Liotti had failed to keep him abreast of developments in the case. (*See id.* ¶¶ 7, 9).

I held the evidentiary hearing on December 18, 1997. On January 9, 1998, Selletti filed another affidavit, apparently without the knowledge and consent of his new counsel, Gadye. In this affidavit, Selletti states:

I want the Court to be aware of the fact as to the reason why this affidavit is being submitted by me and not by my counsel. Unfortunately, I have no idea as to what is being submitted by my [new] counsel to this court.

. . .

It seems to me that every attorney that gets involved with my case, becomes disinterested and fails to comply with Court directives.

. . .

I have no idea what [my new attorney] is presenting to the court.

(Selletti 1/9/98 Aff. ¶¶ 1, 5, 6). Accompanying the affidavit is a memorandum of law that Selletti submitted himself, apparently without Gadye's knowledge, purportedly because he "has been forced to, in part, act as a 'Pro Se' litigant." (Pl. Mem. at 1).

## DISCUSSION

Selletti's motion is denied for two separate and independent reasons. First, the motion is untimely. Second, even considering the motion on the merits, it must be denied, as Selletti has failed to demonstrate any basis for setting aside the order of dismissal.

### A.  *Timeliness*

■ A trial court's ruling on a Rule 60(b) motion is appealable and "a party who is aggrieved by an adverse ruling on a Rule 60(b) motion must appeal it or waive any complaints about the ruling." 12 James W. Moore, *et al., Federal Practice* § 60.69 (3d ed.1997) (*quoted in Beller & Keller v. Tyler,* 120 F.3d 21, 24 (2d Cir.1997)); *accord Bsteem Holding Co. v. Stella,* 1997 WL 576056, *2–3 (S.D.N.Y. Sept. 15, 1997) (denying defendants' second motion to vacate on waiver grounds). Likewise, a Rule 60(b) motion may not be used to circumvent the time limits for appeal. As the Second Circuit has held, Rule 60(b) "may not be used as a substitute for a timely appeal." *Nemaizer v. Baker,* 793 F.2d 58, 61 (2d Cir.1986).

Here, Selletti initially moved to vacate the order of dismissal when Gadye, his new attorney, wrote to the Court on July 16, 1997 requesting that relief. To the extent there was any doubt as to whether the letter was a request for relief under Rule 60(b), that doubt was eliminated when I expressly treated the letter as a Rule 60(b) motion in my July 25, 1997 memorandum decision.[2] To the extent Selletti wanted to make a more formal application, he could have submitted an affidavit with the letter or he could have moved for reargument or reconsideration after I ruled. Alternatively, he could have, and should have, appealed.

Selletti's time to appeal my July 25, 1997 order has now expired. He cannot circumvent the time limits for appeal by now filing a second Rule 60(b) motion. Accordingly, the motion is denied.

### B.  *The Merits*

■ Even assuming the motion is not untimely, it is denied on the merits. As noted, I considered certain relevant factors in my July 25, 1997 decision, *see Selletti,* 174 F.R.D. at 313–15, and I will not repeat that discussion here. I have been presented with nothing on this second Rule 60(b) motion to cause me to change my mind. I will add to my prior discussion of those factors the following thoughts. First, recent developments confirm that Selletti must share blame with Liotti, his prior counsel, for the failures to comply with discovery obligations and court orders. Selletti is now also disparaging Gadye, his new counsel. This is not a coincidence, and I do not accept the proposition that only Selletti's attorneys are at fault. Selletti clearly is at fault himself. For example, as detailed below, Selletti testified that he did not read certain critical portions of the complaint, even though he executed a verification attesting that he had read the complaint. Selletti simply has not conducted himself as a diligent litigant should.

Second, with the additional delay, defendants have suffered even more prejudice. Although the complaint was dismissed months ago, defendants still find themselves litigating this case. Some of the underlying events occurred (if they occurred at all) in 1989, almost nine years ago. Because of the

2. Letters requesting relief of the Court are routinely treated as motions. *See, e.g., Barrett v. F.W. Woolworth Corp.,* 1997 WL 752416, *1 (S.D.N.Y. Dec. 5, 1997) (treating letter from plaintiff's counsel to court as Rule 60(b)(1) mo-tion); *Sala v. Gates Constr. Co.,* 155 F.R.D. 414, 415 n. 2 (E.D.N.Y.1994) ("the Court often accepts letters in place of more formal motions when a letter is sufficient to explain the reasons for such motion").

passage of time, defendants will have difficulty investigating those alleged events. Although it appeared the lawsuit had been concluded by my June 26, 1997 and July 25, 1997 orders, the questions raised by this case would resurface if the suit were now revived. When Selletti appeared on national television in a segment about this case, for example, a photograph of Carey was featured under the headline "THIEVING DIVA?" It would be unfair to require defendants to confront these questions again at this late date, two years after suit was filed, seven months after the suit was dismissed, and six months after Selletti's first Rule 60(b) motion was denied, when the delays are the result of the repeated failures of Selletti and his lawyers to comply with discovery obligations, court orders, and other deadlines.

One additional factor warrants consideration—whether Selletti has a meritorious claim. Because the relief sought under Rule 60(b) is equitable in nature, a court confronted with a motion to vacate a final order or judgment "must balance the policy in favor of hearing a litigant's claims on the merits against the policy in favor of finality." *Kotlicky v. United States Fidelity & Guar. Co.,* 817 F.2d 6, 9 (2d Cir.1987); *see generally* 11 Charles A. Wright, *et al., Federal Practice & Procedure* § 2857, at 255–60 (2d ed.1995). Consequently, courts "have prevented the needless protraction of litigation by requiring the moving party to show a good claim or defense." Wright, *et al., Federal Practice & Procedure,* § 2857, at 260.

After having heard Selletti testify and having considered the additional evidence presented by the parties, I am firmly convinced that Selletti's allegation that defendants misappropriated the lyrics to *Hero* from him is a complete fabrication. I reach that conclusion for at least four reasons. First, Selletti's story is patently incredible. Second, defendants' evidence that the lyrics were written by Carey and Afanasieff is convincing. Third, Selletti has contradicted himself in material respects. Finally, Selletti has behaved not like a plaintiff with a meritorious claim but like a plaintiff without a legitimate claim who instead is intent on extorting potentially deep-pocket defendants.

I note that in reaching the conclusion that Selletti's claims are without merit, I have not engaged in factfinding as I would if I were trying the case on the merits, nor have I sought to determine whether Selletti is likely to prevail if he were permitted to pursue his claims. Rather, I have limited myself to determining whether there is *some* merit to his claims. I conclude that there is not.

### 1. *Selletti's Story*

At the December 18, 1997 hearing, Selletti testified as follows:

He worked for Sly Stone in 1989; he "took" Stone from "place to place," "became more like a personal assistant," made phone calls for Stone, cooked for him, cleaned his clothes, and "h[u]ng out with him." (Tr. 22).[3] He has been writing "poems" since 1984 or 1985. While working for Stone in 1989, he wrote the "poem" in question, which he described as "my lyrics." (Tr. 22, 25–28). He sat down and wrote the lyrics in "one stream." (Tr. 24; *see also* Tr. 25). There were "no prior drafts" and it took him about "[f]ive minutes." (Tr. 25, 79; *see also* Tr. 101–02). Stone was watching when he wrote the "poem" and asked to read it. Stone showed the "poem" to Jerry Goldstein. The next day Stone asked for a copy and Selletti gave it to him. (Tr. 26–31). Shortly thereafter Selletti was fired. (Tr. 34). He never heard from Stone about the song again. In June 1990, Selletti mailed a copy of the poem to himself, to "[p]rotect my song, protect the lyric." (Tr. 36). Nothing further happened

---

**3.** In the videotaped interview, Selletti stated that he worked as Stone's "personal bodyguard." He testified that he is now employed drawing blood and doing medical exams for insurance companies and that previously he was in the delicatessen business. (Tr. 19). When asked what he did for the balance of the time from October 1989, when he stopped working for Stone, to the present, he said: "I was going to court." (Tr. 20).

He then explained that after he started his delicatessen, "one of my employees burnt the place down and accused me of killing him." (Tr. 21). He then explained that he meant he was accused of trying to kill the employee, that he was arrested by "Homicide," and that after two years he was acquitted following a trial that lasted 30 days. (Tr. 21–22).

with respect to his "poem" until 1993, when his then-fiancee brought home a CD of Mariah Carey's *Music Box.* (Tr. 41) When he heard the song *Hero,* he "freaked out." (*Id.*)

Selletti's story is not credible. I do not believe that he sat down in 1989 and wrote the lyrics in "one stream" in just five minutes, without any re-writing, and that what he wrote became—virtually unchanged—the lyrics to Mariah Carey's hit song *Hero* in 1993.[4] Selletti's theory—that two successful songwriters, including one who is a superstar of pop music, misappropriated his lyrics (which took him but five minutes to write) and published them as their own essentially without changing a word—is patently unbelievable.

### 2. *Defendants' Evidence*

In contrast, defendants' evidence as to the authorship of the lyrics is extremely convincing. The two tapes of the working sessions show Carey and Afanasieff working on the song, composing the music and writing the words. As shown on the tapes, the two work in fits and starts. They play the piano and sing, they stop, they talk, they start again, and they try different options. They talk about whether the words rhyme. Carey sings some words, then sings "do, do, do, do, do, do." The words are not identical to the final lyrics, although some lines are similar, such as:

A hero comes along,

And you cast your fears aside,

And you know you can survive,

So when you feel like hope is gone,

Look inside, look inside,

And you see the song,

That the truth lies in you.

(Tr. 8; *see also* Tr. 82–83). At the end of one tape, Carey sings a rough version of the entire song. The music is very similar to the music of the final song. The words are different, but the line "when the hero comes along" is repeated several times. The tapes show a work-in-progress and clearly have the earmarks of genuineness.

Likewise, Carey's writing book appears to be genuine. It is a hard-cover book, originally consisting of blank pages, that appeared to be somewhat aged, with loose sheets of paper inserted between the pages from place to place. (Tr. 12–14). The book is now filled with writing, including what appears to be various versions of the lyrics to *Hero* in what is apparently Carey's handwriting. Certain words or lines are written, sometimes in pencil and sometimes in pen, with some words crossed-out or added in a different color. In places Carey was apparently searching for a rhyme, as she writes, for example, "go, no, show, grow, alone and hold." (Tr. 11). In other places, she doodles (drawing hearts, for example), makes notes to herself, and lists telephone numbers. (Tr. 12). Many of the pages are dated, including dates from 1992 and 1993. In short, the book appears genuine and shows the lyrics to *Hero* as a work-in-progess.

If Selletti is telling the truth, both tapes as well as the book would have to be fabrications. I do not believe that they are.

Finally, defendants' counsel represented that the producers of the movie *Hero* approached Afanasieff about writing a song for the movie. Afanasieff in turn approached Carey about writing the song. (Tr. 3–5). In fact, Carey and Afanasieff can be heard on one of the tapes talking about the movie. As Afanasieff describes the movie to Carey, he explains that the Dustin Hoffman character is "a real shitty guy," "a scumbag," "a crook," who is recognized "at the end of the movie [as] the hero." Carey responds by saying "That's cool" and she starts to sing "Dum da da da."

In the end, the filmmakers opted not to use the Carey–Afanasieff song. I have now watched the videotape and it does appear that the song *Hero* was written for the movie *Hero.* Both offer the same theme: that there is a hero inside each of us, even those—like "Bernie LaPlante," the Dustin Hoffman character—who may be down and out and unlikely to be a hero. Again, this evidence is compelling proof that Carey and Afanasieff actually wrote the song.

---

**4.** Selletti testified that he has never had any lyrics published and that until recently no one had ever written any music for any of his lyrics. (Tr. 40).

### 3. Selletti's Inconsistencies

Selletti has contradicted himself repeatedly in material respects. Four examples are as follows:

First, Selletti testified at the hearing that he willingly gave a copy of his poem to Stone in 1989 and that he was not aware that anyone had taken the poem from him without his permission. (Tr. 84). Yet, in his verified complaint, he alleged that certain of the defendants appropriated "copies" of the "SUBJECT WORK" from his "notebook" without his "knowledge or consent." (*See* Tr. 84–85; Compl. ¶ 8). At the hearing, he tried to explain away this gross inconsistency by testifying that he did not read the complaint before it was filed. (Tr. 85–86).

Second, although the complaint clearly alleges that the "SUBJECT WORK" was taken from Selletti's "notebook," Selletti testified at the hearing that the "poem" in question was never even kept in a notebook. (Tr. 100, 106).

Third, in the videotaped interview, Selletti states that when Stone read the lyrics and said he was going to do something with them for Selletti, "at that time" Selletti mailed the lyrics to himself. (*See* Tr. 93–94). Yet, at the hearing, he testified that he wrote the lyrics and showed them to Stone either in the summer of 1989 or the end of September or early October 1989 (Tr. 25–26, 88) and that he did not mail the lyrics to himself until June 1990 (Tr. 35), many months later. The complaint makes no reference to any such mailing at all.

Finally, at the hearing Selletti provided an explanation of what he meant by the lyrics. That explanation, however, is not consistent with either his prior explanation or the actual words. He testified as follows:

> THE COURT: What were you trying to say in those lyrics?
>
> THE WITNESS: What was I trying to say?
>
> THE COURT: Yes.
>
> THE WITNESS: Everything I went through, OK. I felt that my pride was gone. I felt betrayed. I felt I was torn apart but, through my religion and what I believe in, I had to find myself again, to come out of what I was in.
>
> THE COURT: That's what you intended by the song?
>
> THE WITNESS: Right.

(Tr. 79–80). At an earlier point in the hearing, Selletti claimed that "I had just go[ne] through a bad separation, and I just started thinking about what was going on, and that's when I wrote [the poem]." (Tr. 27–28).

The explanation provided by Selletti at the hearing is very different from the one he gave during the videotaped interview in May 1996, when he essentially parroted a line from the song and explained that the song was about "finding strength within yourself to carry on." In addition, the actual lyrics do not talk about a loss of pride, betrayal, finding oneself through religion, or separation from a loved one. Rather, the lyrics speak of how we all are heroes and how we all have the strength within us to be heroes and to help ourselves. As John Bubber, the homeless person turned hero played by Andy Garcia in the movie, says at the end of the movie when asked by the Geena Davis character whether he sees himself as a hero:

> We're all heroes, if you catch us at the right moment. We all have something noble and decent in us trying to get out. And we're all less than heroic at other times. . . . I'm just like the next person, full of frailty, with some courage, some decency mixed in. You think I'm a hero. To me, a hero is just a symbol of what's good in all of us.

### 4. Selletti's Failures in this Lawsuit

I do not know whether, in filing this lawsuit and claiming authorship of the lyrics to the song, Selletti was trying to be a "hero" or whether he was merely motivated by greed. I do know that he has failed utterly to meet his obligations in the case, and that he has not litigated like a person with a meritorious claim.

Although the song *Hero* was released in 1993, Selletti did not file suit until 1996. Even then, instead of pursuing his claims aggressively, he and his attorneys delayed at every step of the way. He ignored his dis-

covery obligations and repeatedly failed to comply with orders of the Court. Although he refused to produce documents in discovery, he and his attorneys freely provided them to the media. Even after the case was dismissed, he and his new attorney failed to promptly seek relief. In addition, Selletti made an allegation in his complaint that he swore he believed to be true. Yet he later testified under oath that the allegation was not true. He then tried to explain away the inconsistency by declaring that he had not read the complaint before it was filed.

In view of Selletti's failures in this lawsuit, I have great difficulty believing that there is any merit to his claims. If his allegations were true, one would have expected him to have litigated the case aggressively and forthrightly and to have fully complied with his obligations in the case.

### CONCLUSION

Selletti's right to have his claim heard on the merits is clearly outweighed by the policy considerations in favor of finality. Accordingly, his motion to vacate the order of dismissal is denied.

SO ORDERED.