Filed: January 17, 2001

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 99-1617
(CA-97-1470-MJG)

Frederick E. Bouchat,

Plaintiff - Appellee,

versus

Baltimore Ravens, Inc., et al.,

Defendants - Appellants.

O R D E R

The court amends its published order filed December 28, 2000, and further amends its opinion filed October 3, 2000, as follows:

Footnote AI is deleted from page 11 of the opinion and moved to page 6, second full paragraph, line 14, after the word "favor."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

Filed: December 28, 2000

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 99-1617

FREDERICK E. BOUCHAT,

Plaintiff-Appellee,

versus

BALTIMORE RAVENS, INCORPORATED;
NATIONAL FOOTBALL LEAGUE
PROPERTIES, INCORPORATED,

Defendants-Appellants.

O R D E R

We have considered the petition for rehearing in this case, filed by Baltimore Ravens, Inc., et al., and the response of Bouchat.

Upon a request for a poll of the court, Judges Wilkinson, Niemeyer, Michael, Motz and King voted to grant rehearing en banc. Judges Widener, Wilkins, Luttig and Traxler voted to deny rehearing en banc.*

Fewer than a majority of the circuit judges who are in regular active service having voted for rehearing en banc, it is accordingly ADJUDGED and ORDERED that the petition for rehearing en banc shall be, and it hereby is, denied.

The panel considered the petition for rehearing and is of opinion it is without merit.

It is accordingly ADJUDGED and ORDERED that the petition for rehearing shall be, and it hereby is, denied.

It is FURTHER ORDERED that the opinion in this case shall be, and it hereby is, amended by adding thereto Footnote AI in the slip opinion, page 6, following the word "favor," the last word of Part II of the opinion.  Footnote AI is attached hereto and made a part hereof.

It is FURTHER ORDERED that the slip opinion shall be, and it hereby is, further amended by the addition of Footnote 10 following the word "him" in the third line from the bottom of page 23 of the slip opinion, which Footnote 10 is attached hereto and made a part hereof.

With the concurrence of Judge J. H. Michael.  Judge King dissents.  He would grant rehearing and require judgment to be entered for the defendants, for the reasons expressed in his dissenting opinion.


/s/ H. E. Widener, Jr.
_____
       For the Court


*Judge Williams being disqualified, did not participate in the decision in this case.

Footnote AI


[PICTURES NOT AVAILABLE]


Plaintiff's Drawing        The Accused Work


A copy of the plaintiff's shield logo and the accused work of the NFL Properties is shown above. There is no dispute as to the similarity of the works, not only because the similarity is facially indisputable, but the defendants' expert witness testified, and the plaintiff's expert agreed, that the designs are so similar that they could not have been created independently from one another. The dissent notes that "it is just as likely that Bouchat copied the Ravens logo as vice versa." *Infra*, note 10. The jury decided this issue of fact after considering such evidence as: the testimony from 19 identification witnesses for the plaintiff that they had seen the plaintiff's shield drawing in late 1995 (two of whom had received copies of the shield drawing as Christmas presents in December, 1995); the March 28, 1996 offer from Mr. Moag to forward Bouchat's drawings to Mr. Modell; the forwarding by Mr. Modell to NFL Properties of unsolicited sketches on at least two occasions in the relevant time period; Bouchat's April 1 or 2, 1996 fax of his shield drawing to Moag; the defendants' inability to present convincing evidence of any preliminary sketches or drawings before April 2, 1996 by NFL Properties of the Ravens shield logo; the June 6, 1996 unveiling of the Ravens shield logo; and the instant recognition by Bouchat and others of the Ravens logo as a copy of Bouchat's work.

The dissent states that there is evidence counter to the above, but such a conflict in evidence presents the classic jury issue, and the jury's resolution of that issue was for the plaintiff.

Footnote 10

     The panel majority has affixed to its opinion Bouchat's shield drawing and the Ravens logo, apparently to illustrate their "striking similarity" to each other. It strikes me that these drawings better illustrate the point made in the Keats' hypothetical. In fact, it is just as likely that Bouchat copied the Ravens' logo as vice versa. It bears repeating, see supra note 1, that Bouchat did not copyright his shield drawing until nearly two months after the Ravens unveiled their logo.

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

FREDERICK E. BOUCHAT,
Plaintiff-Appellee,

v.

No. 99-1617

BALTIMORE RAVENS, INCORPORATED;
NATIONAL FOOTBALL LEAGUE
PROPERTIES, INCORPORATED,
Defendants-Appellants.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, District Judge.
(CA-97-1470-MJG)

Argued: March 3, 2000

Decided: October 3, 2000

Before WIDENER and KING, Circuit Judges, and
James H. MICHAEL, Jr., Senior United States District Judge
for the Western District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Senior Judge Michael wrote the opinion, in which Judge Widener joined. Judge King wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Robert Lloyd Raskopf, WHITE & CASE, L.L.P., New York, New York, for Appellants. Howard J. Schulman, SCHULMAN

& KAUFMAN, L.L.C., Baltimore, Maryland, for Appellee. **ON BRIEF:** John Paul Reiner, Marc E. Ackerman, WHITE & CASE, L.L.P., New York, New York; George Beall, HOGAN & HARTSON, L.L.P., Baltimore, Maryland, for Appellants. Robert J. Kasunic, Germantown, Maryland, for Appellee.

_____

## OPINION

MICHAEL, Senior District Judge:

Frederick E. Bouchat (the "plaintiff-appellee") filed this action, seeking $10,000,000 in damages, in the United States District Court for the District of Maryland, alleging that the Baltimore Ravens, Inc. and National Football League Properties, Inc. (the"defendants-appellants") had infringed his copyright rights in three different drawings consisting entirely of his original work, including a shield drawing created by Bouchat in late 1995 when developing his "shield logo" for the new National Football League team-- the Baltimore Ravens. Bouchat holds a copyright on his shield drawing and claims that the defendants' designers copied protected elements of that drawing. The defendants claim that they developed the Baltimore Ravens' official shield logo independently. The case was tried before a jury over nearly five weeks in October and November 1998. The jury returned a verdict in favor of Bouchat. The defendants filed a motion for judgment as a matter of law notwithstanding the verdict or, in the alternative, for a new trial as to the third drawing, contending -- among other things -- that the plaintiff failed to prove that the defendants had access to Bouchat's drawing. The district court, by order, denied defendants' motion in February of 1999. In April 1999, however, the District Court certified several questions to this court which form the basis of this interlocutory appeal. Based upon the reasoning below, this court affirms the decision of the district court.

I.

Frederick Bouchat is an amateur artist. He has a ninth grade education, and now works as a front entrance security guard at the State of Maryland Office building on St. Paul Street in Baltimore. Bouchat

2

often showed his artwork to people passing through the building's main entrance.

As news of an NFL team for Baltimore spread in 1995, Bouchat created drawings and designs for the team based on his favorite possible team name -- the Ravens. Bouchat created a helmet design and affixed his creation to a miniature football helmet. Bouchat gave the design and helmet to Eugene Conti, a state official who worked in the St. Paul Street office building. Conti kept the helmet displayed in his office. Bouchat showed other team drawings to employees of the building, and gave two drawings away as holiday gifts in December of 1995.

Conti asked a colleague to arrange a meeting between Bouchat (an enthusiastic Baltimore fan) and John Moag, chairman of the Maryland Stadium Authority (the man who brought the team to Baltimore) in order to include a story about Bouchat in the employee news letter. On March 28, 1996, Bouchat was taken to meet Moag at Moag's law office on Pratt Street. The Ravens, and David Modell (the team's owner) occupied the same office suite in the Pratt Street building as a temporary space at this time.

At the meeting, photos were taken and Moag told Bouchat that the team was going to be named the Ravens. When Bouchat described his drawings, Moag told Bouchat to send his drawings along, and Moag would give them to the Ravens for consideration. The next day, Bouchat got permission from his supervisor to use the office fax machine in order to send his drawings to Moag at the Maryland Stadium Authority (MSA). Jan Drabeck, Bouchat's immediate supervisor, showed Bouchat how to use the fax machine.

On April 1 or 2, 1996, Bouchat faxed his drawings to the MSA. He received a fax confirmation but did not retain the printed confirmation receipt. One of the drawings Bouchat faxed to the MSA was his shield drawing.

On April 2, 1996, Modell met with the NFL Properties Design Director to discuss the development of a Ravens logo. Thereafter, Modell communicated with the design team concerning the logo proj-

3

ect. The Ravens unveiled their new logo in June of 1996. The new Ravens logo was a Raven holding a shield.

Bouchat and several of his co-workers immediately recognized the new logo as Bouchat's work. Bouchat contacted a lawyer, and in August of 1996 he obtained copyright registration for his shield drawing. In May of 1997 Bouchat filed this lawsuit against the Ravens and NFL Properties for infringing his copyright on the design at issue. In November of 1998, the jury returned a verdict in favor of the plaintiff, but only as to his shield drawing.**1** Defendants filed a motion for judgment as a matter of law which the district court denied. The district court then certified the following questions for interlocutory appeal: (1) Was the plaintiff's proof of a reasonable possibility of access legally insufficient? (2) If so, will the Fourth Circuit adopt the "strikingly similar" doctrine inferring access, as expressed in Gaste v. Kaiserman, 863 F.2d 1061, 1968 (2d Cir. 1988)? (3) Should the copyright infringement claim be dismissed because the plaintiff failed to note the derivative nature of the shield drawing on the application for copyright, where defendants have not proven fraud or a purposeful failure to advise the copyright office of facts that might have caused rejection of the application? (4) Did the court improperly coerce the jury to reach its verdict? These four questions are the basis for the defendants' interlocutory appeal.

II.

To prove copyright infringement, a plaintiff must show first that he owned the copyright to the work that was allegedly copied, and second, that the defendant copied protected elements of the work. See Towler v. Sayles, 76 F.3d 579, 581 (4th Cir. 1996) (citing Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361 (1991)). Where direct evidence of copying is lacking, plaintiff may prove copying by circumstantial evidence in the form of proof that the alleged infringer had access to the work and that the supposed copy is substantially similar to the author's original work. See Towler, 76 F.3d at 581-82.

_____

**1** Bouchat claimed copyright infringement as to three drawings, but only won a favorable verdict as to the shield drawing. Only the verdict as to the shield drawing is challenged on appeal.

4

Defendants contend that Bouchat did not establish access. To prove access, Bouchat was required to show that the NFL designers, the alleged infringers, had an opportunity to view Bouchat's drawing. See id. at 582. The jury was entitled to infer that the NFL designers had access if a third party intermediary (Modell) with a close relationship to the alleged infringers (the NFL designers) had access. See id. at 583. This court, however, has rejected mere "speculative reasoning" as a basis for proving access, especially when intermediaries are involved. Id. Reasoning that amounts to nothing more than a "tortuous chain of hypothetical transmittals" is insufficient to infer access. Id. at 583 (quoting Meta-Film Assoc., Inc. v. MCA, Inc., 586 F. Supp. 1346, 1355 (C.D. Cal. 1984)).

Defendants, in denying actual receipt of Bouchat's faxed drawings, claim that Bouchat's proof amounts only to a "tortuous chain of hypothetical transmittals" and therefore is legally insufficient to prove access. Defendants' argument is not persuasive. In Towler, the plaintiff relied on the theoretical possibility that agents to whom she had sent her screenplay "could have sent the work to" the alleged infringer. Id. There was no evidence that the agents had sent the work to the defendant, only the plaintiff's suggestion that such a transmittal was hypothetically possible. This, the Fourth Circuit concluded, was not adequate proof of access. See id.

Bouchat offered evidence that his shield drawing was transmitted first to Moag, who shared an office with Modell (who had a close relationship with the alleged infringers on the design project). Bouchat testified that Moag offered to forward his (Bouchat's) drawings to the Ravens and that Bouchat sent the fax of the drawings to MSA, addressed to Moag. The jury was entitled to credit that testimony. Evidence was also introduced that the regular practice at the MSA was to forward faxes for Moag to his Pratt Street office. The jury was thus entitled to conclude that the faxed drawing reached Moag at the Pratt Street office. Defendants admit that Modell and other Ravens staff shared office space with Moag in the Pratt Street building, and that Modell's own office was within"earshot" of Moag's office. By proving that the drawings were transmitted to Moag, and that Modell shared the same office space with Moag, Bouchat proved that Modell had "access" to Bouchat's drawing. The chain of transmittals is far more than hypothetical -- it is based on

5

the testimony of Bouchat and the evidence regarding standard office routines at the MSA. See Fed. R. Evid. 406.

The defendants successfully argue that Bouchat did not prove that Modell _actually saw_ Bouchat's drawings. However, Bouchat was not required to prove that Modell in fact saw the drawings and copied them. Rather, Bouchat was merely required to prove that Modell had _access_ to the drawings by showing Modell had the opportunity to view them. See Towler, 76 F.3d at 582. Bouchat clearly presented sufficient evidence to sustain that burden. Having concluded that Modell had access to the drawings, the jury was able to combine that conclusion with the substantial similarity between the Raven's logo and Bouchat's drawing to find, ultimately, that the Ravens copied Bouchat's copyrighted work.

The district court, in its memorandum opinion, speculates that the fax addressed to Moag might have been misdelivered to Modell himself, since Modell's name appeared in the message written on the fax and since the fax featured a large raven, concerning which Modell would obviously be the interested party. Bouchat's evidence is sufficient to demonstrate access even if we do not posit any fortuitous misdelivery of the fax. A copyright infringement plaintiff need not prove that the infringer actually saw the work in question; it is enough to prove that the infringer (or his intermediary) had the mere opportunity to see the work and that the subsequent material produced is substantially similar to the work. See id. Adequate evidence of the infringer's or the intermediary's opportunity to see the work exists and therefore Bouchat's proof of access is legally sufficient to sustain the jury's verdict in his favor.AI

III.

The second question certified on interlocutory appeal is conditional, requesting a response if the answer to the first certified question was that the plaintiff's evidence of access was insufficient. This court remains firm in its holding that the plaintiff's evidence of access is legally sufficient to sustain the jury's verdict. However, this court also finds it proper to briefly address the question of whether this circuit will adopt the "strikingly similar" doctrine inferring access, as expressed in Gaste v. Kaiserman, 863 F.2d 1061, 1968 (2d Cir. 1988).

6

AI

[PICTURES NOT AVAILABLE]

Plaintiff's Drawing          The Accused Work

A copy of the plaintiff's shield logo and the accused work of the NFL Properties is shown above.  There is no dispute as to the similarity of the works, not only because the similarity is facially indisputable, but the defendants' expert witness testified, and the plaintiff's expert agreed, that the designs are so similar that they could not have been created independently from one another.  The dissent notes that "it is just as likely that Bouchat copied the Ravens logo as vice versa." *Infra*, note 10.  The jury decided this issue of fact after considering such evidence as:  the testimony from 19 identification witnesses for the plaintiff that they had seen the plaintiff's shield drawing in late 1995 (two of whom had received copies of the shield drawing as Christmas presents in December, 1995); the March 28, 1996 offer from Mr. Moag to forward Bouchat's drawings to Mr. Modell; the forwarding by Mr. Modell to NFL Properties of unsolicited sketches on at least two occasions in the relevant time period; Bouchat's April 1 or 2, 1996 fax of his shield drawing to Moag; the defendants' inability to present convincing evidence of any preliminary sketches or drawings before April 2, 1996 by NFL Properties of the Ravens shield logo; the June 6, 1996 unveiling of the Ravens shield logo; and the instant recognition by Bouchat and others of the Ravens logo as a copy of Bouchat's work.

The dissent states that there is evidence counter to the above, but such a conflict in evidence presents the classic jury issue, and the jury's resolution of that issue was for the plaintiff.

The strikingly similar doctrine, as expressed in <u>Gaste</u>, permits an inference of access in cases where the two works in question are so similar as to create a high probability of copying and negate the reasonable possibility of independent creation. <u>See id</u>. at 1067-68. The Seventh Circuit has also adopted this doctrine in agreement with <u>Gaste</u>, holding that "a similarity that is so close as to be highly unlikely to have been an accident of independent creation is evidence of access." <u>Ty, Inc. v. GMA Accessories, Inc.</u>, 132 F.3d 1167, 1170 (7th Cir. 1997). The Fifth Circuit, on the other hand, has held that where there is striking similarity that precludes the possibility of independent creation, "`copying' may be proved without a showing of access." <u>Ferguson v. National Broadcasting Co., Inc.</u>, 584 F.2d 111, 113 (5th Cir. 1978) (citations omitted). Unlike the Fifth Circuit, this court does not favor the wholesale abandonment of the access requirement in the face of a striking similarity. Rather, like the Second and Seventh Circuits, this court recognizes that striking similarity is one way to demonstrate access. Access remains an indispensable part of a copyright infringement claim.

As made clear by the Second Circuit in <u>Gaste</u>, "Though striking similarity alone can raise an inference of copying, that inference must be reasonable in light of all the evidence." 863 F.2d at 1068; <u>see also</u> <u>Selle v. Gibb</u>, 741 F.2d 896, 901 (7th Cir. 1984) ("no matter how great the similarity between the two works, it is not their similarity <u>per se</u> which establishes access"). Furthermore, the Second Circuit went on to explain that "[a] plaintiff has not proved striking similarity sufficient to sustain a finding of copying if the evidence as a whole does not preclude any reasonable possibility of independent creation." <u>Id</u>. (citations omitted). It is clear that a showing of striking similarity does not <u>per se</u> relieve the plaintiff of his burden of establishing access. However, striking similarity is circumstantial evidence of copying, thereby supporting an inference of access. What is important is that the access prong remains intact, but the level of similarity between the contested works can be used as evidence of access. Any finding of access must be reasonable in light of all of the facts of a particular case. This interpretation is consistent with that of the Second and Seventh Circuits. There is no binding precedent in the Fourth Circuit that addresses the substance of the <u>Gaste</u> opinion.**2**

_____

**2** Prior to the instant opinion, this court has only cited <u>Gaste</u> in one published opinion. In <u>Towler v. Sayles</u>, this court mentions <u>Gaste</u> but

7

As discussed in Section II of this opinion, the plaintiff in this matter made a reasonable showing of access, independent from the striking similarity of the works. However, the striking similarity of the works was a proper factor for the jury to consider, in conjunction with all other evidence, to determine whether the plaintiff had proven copying by circumstantial evidence.

IV.

Defendants contend that Bouchat's drawing does not qualify for copyright protection, because it does not contain sufficiently original elements. However, the copyright infringement claim should not be dismissed based on alleged defects in plaintiff's copyright application. Defendants' argument on this point must be rejected.

Bouchat's drawing contains several public domain elements which are not protectable. These elements, however, were selected, coordinated, and arranged in such a way as to render the work original. See Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 345-46, 358 (1991); M. Kramer Manufacturing Co., Inc. v. Andrews, 783 F.2d 421, 438-39 (4th Cir. 1986). The drawing, therefore, is entitled to copyright protection.

The district court recognized that Bouchat failed to note the derivative nature of his authorship in his copyright application, but the court also found that there is no evidence of any fraudulent or knowing misstatement with regard to the application. (JA at 1310.) This court held, in Service & Training, Inc. v. Date General Corp., 963 F.2d 680, 689 (4th Cir. 1992), that an inadvertent omission will not invalidate a copyright registration.

Defendants argued below that the alleged flaw in Bouchat's copyright application served to divest the district court of subject matter jurisdiction over the infringement claim. (JA at 1310.) On appeal, they now argue that the flaw in the application serves to divest

_____
expressly declined to answer the question as to the requisite proof of access in the face of striking similarity. See 76 F.3d 579, 584-85 (4th Cir. 1996).

8

Bouchat of all copyright protection and thus is fatal to his infringement claim as a threshold matter. However, the premise on which this argument is built -- that Bouchat's drawing is not protectable -- is simply wrong. Neither the fact that Bouchat incorporated public domain elements in his drawing (the letter "B", a cross, a shield) nor the fact that he did not expressly indicate on his application that such elements rendered his authorship of the drawing derivative in nature, invalidate the protection to which his drawing is otherwise entitled under his valid copyright registration. See Service & Training, 963 F.2d at 689. Accidental but harmless mistakes in a copyright application do not subsequently preclude an infringement action against an alleged copier.

V.

Although the jury had difficulty in reaching a verdict, and the district court judge gave supplemental instructions twice, including an Allen charge, the court did not improperly coerce the jury to reach its verdict. Supplemental instruction may not be coercive, and a reviewing court must consider the totality of the circumstances in deciding whether the trial court abused its discretion. Bristol Steel & Iron Works, Inc. v. Bethlehem Steel Corp., 41 F.3d 182, 191 (4th Cir. 1994).

The district court delivered the Allen charge on Friday, October 30, 1998 at 2:10 PM. The jury continued to deliberate until 5 PM that day, and again on Tuesday, November 3. On Tuesday, the jury sent a note to the judge, in response to which the court delivered further supplemental instructions. When the court inquired as to the scheduling preferences of the jurors later that afternoon, they responded at 4:30 PM, indicating that they were making progress. At 5:10 PM the jury reached its verdict.

The district court specifically told the jurors that it was not suggesting anyone surrender their honest convictions about the case. (JA 1200-1201.) The district court characterized its instructions as "fair and balanced," (JA 1327), and such a characterization is accurate. The fact that the jurors were actively encouraged to persist in their effort to reach consensus does not mean that they were coerced.

9

VI.

Based on the foregoing, this court affirms the district court's denial of the defendants' motion for judgment as a matter of law, and responds to the question posed in the interlocutory appeal.

AFFIRMED

KING, Circuit Judge, dissenting:

Because the jury's verdict in favor of Bouchat is entirely without legal or factual support, the district court erred in denying the defendants' renewed motion for judgment as a matter of law. The defendants are entitled to judgment, and therefore I must respectfully dissent.

I.

We review de novo the district court's denial of the defendants' Rule 50(b) motion for judgment as a matter of law, viewing the evidence in the light most favorable to Bouchat, and giving him the benefit of all reasonable inferences. See Austin v. Paramount Parks, Inc., 195 F.3d 715, 727 (4th Cir. 1999). If there is evidence upon which a reasonable jury could have found in Bouchat's favor, we are obliged to affirm the jury's verdict. Duke v. Uniroyal, Inc., 928 F.2d 1413, 1417 (4th Cir. 1991).

Although appellate courts are "compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them, we are not a rubber stamp convened merely to endorse the conclusions of the jury, but rather have a duty to reverse the jury verdicts if the evidence cannot support it[.]" Price v. City of Charlotte, 93 F.3d 1241, 1250 (4th Cir. 1996) (internal citations omitted). Judgment as a matter of law is appropriate when "there is no legally sufficient evidentiary basis" to support the jury's verdict. Fed. R. Civ. P. 50(a)(1).

II.

To prove copyright infringement, a plaintiff must present evidence

10

establishing two elements by a preponderance of the evidence: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). I agree with the majority that Bouchat has satisfied the first element of a copyright infringement action. Ante at 8-9. That is, Bouchat does possess a valid certificate of copyright registration for his shield drawing from the United States Copyright Office -- dated almost two months after the Ravens publicly unveiled their shield logo.[1] See J.A. 27.

With regard to the second element, however, I simply cannot agree with the majority's conclusion that this evidentiary record establishes that the defendants copied Bouchat's shield drawing. Proof of copying may be accomplished by either direct evidence or circumstantial evidence. Keeler Brass Co. v. Continental Brass Co., 862 F.2d 1063, 1064 (4th Cir. 1988). In cases where direct evidence is lacking, a plaintiff may prove copying by presenting circumstantial evidence that: (i) the alleged infringer had access to the plaintiff's work; and (ii) the infringer's work is "substantially similar" to the plaintiff's original. Towler v. Sayles, 76 F.3d 579, 581-82 (4th Cir. 1996).

In this case, Bouchat presented no direct evidence that the defendants copied his drawing in creating the Ravens shield logo. Thus, Bouchat bore the burden of demonstrating through circumstantial evidence that the defendants had access to his work, and that the Ravens shield logo is "substantially similar" to his original work. As the district court recognized, substantial similarities in the two works are readily apparent. Therefore, the outcome of this proceeding hinges on a single inquiry: whether Bouchat demonstrated that the defendants had "access" to his shield drawing.

III.

To prove access, Bouchat was required to show that the defendants -- specifically the NFLP designers charged with creating the logo for Baltimore's new professional football franchise-- had a reasonable

_____

[1] Bouchat's copyright registration is dated July 25, 1996. The Ravens publicly unveiled their new uniforms and insignia, including the shield logo, on June 6, 1996.

11

opportunity to view, and thereby copy, his shield drawing. See ante at 5 (citation omitted). A "mere possibility" is not enough; rather it "must be reasonably possible that the paths of the infringer and the infringed work crossed." Towler, 76 F.3d at 582 (emphasis added) (citing Moore v. Columbia Pictures Indus., Inc., 972 F.2d 939, 942 (8th Cir. 1992)). Indeed, as the majority recognizes, speculative reasoning that "amounts to nothing more than a `tortuous chain of hypothetical transmittals' is insufficient to infer access." Ante at 5 (citing Towler, 76 F.3d at 583) (quoting Meta-Film Assocs. v. MCA, Inc., 586 F. Supp. 1346, 1355 (C.D. Cal. 1984)).

Notwithstanding the majority's casting aside of the substance of Towler, that decision's characterization of "speculative reasoning" is quite apposite here, because Bouchat's evidence of access constitutes nothing more than a "tortuous chain of hypothetical transmittals." To conclude that Bouchat demonstrated "access," the jury necessarily found that Bouchat's shield drawing travelled the following circuitous route:

> - the Maryland Stadium Authority ("MSA") actually received Bouchat's facsimile transmission (Step 1);
>
> - MSA then forwarded Bouchat's fax to the Pratt Street office of John Moag's law firm (Step 2);
>
> - David Modell of the Baltimore Ravens (which rented office space in the Pratt Street building housing Moag's law firm -- but on a different floor than Moag), received Bouchat's drawing (Step 3);
>
> - Modell, or someone else within the Ravens organization, forwarded Bouchat's drawing to designers Rhonda Kim and Kurt Osaki of the NFLP in New York (Step 4).

Based on the evidence presented at trial, including Bouchat's testimony that he faxed the drawing to MSA and evidence that MSA regularly forwarded certain correspondence to Moag's law office, the majority finds that Bouchat has met his initial burden in showing that Steps 1 and 2 may have been reached, and that "[t]he jury was thus

12

entitled to conclude that the faxed drawing reached Moag at the Pratt Street office." Ante at 5.

A.

Given our limited standard of review, I am constrained to agree with the majority that the jury was entitled to credit Bouchat's testimony that he faxed his shield drawing to MSA's office. However, the evidence supporting such a finding, consisting solely of Bouchat's own testimony, is marginal at best.[2] Bouchat presented no witnesses who saw him send the fax; he submitted no confirmation sheet verifying that the facsimile transmission was successful; and he failed to produce any telephone records confirming the transmission. Moreover, the Deputy Director of MSA testified that, following the initiation of this lawsuit, he conducted an investigation to determine whether MSA had received Bouchat's fax. Based on this investigation, he concluded that "[e]very member of [MSA] staff said they had no knowledge of this drawing." J.A. 322.

Nevertheless, I agree with the majority that a reasonable jury could have concluded that Step 1 was adequately proved, and that Bouchat faxed the shield drawing to MSA. However, this is merely the beginning, rather than the end, of our inquiry; Bouchat was required to prove much more.

B.

With regard to Step 2, I cannot agree that the jury, on this evidence, could find the fax reached Moag at the Pratt Street office of his law firm, Patton Boggs. In support of its conclusion otherwise, the majority relies solely on evidence "that the regular practice at MSA was to forward faxes for Moag to his Pratt Street office." Ante at 5. From this evidence, the jury apparently inferred that Moag had received Bouchat's shield drawing prior to creation of the Ravens shield logo.

_____

[2] Even the jury was not fully convinced by Bouchat, as evidenced by their simultaneous and inconsistent verdict that he failed to prove that he had faxed two other drawings along with the shield drawing. J.A. 1237, 1239-40.

13

However, "an inference must be a logical and reasonable deduction from the facts proved. It may be unreasonable if it is at war with uncontradicted or unimpeached facts." Selle v. Gibb, 567 F. Supp. 1173, 1182 (N.D. Ill. 1983), aff'd, 741 F.2d 896 (7th Cir. 1984) (internal quotations and citation omitted).[3] Thus, if a plaintiff's claim is based upon inferences, they must be logical and reasonable, and not directly contradicted by otherwise undisputed facts. Only then are the inferences permissible.

In this case, the evidence does not permit the inference that Moag received Bouchat's shield drawing. First, beyond the preliminary inference that the fax was received by MSA, Bouchat offered no direct evidence that MSA thereafter forwarded the shield drawing to Moag. Nevertheless, the majority approves of the additional inference -- based exclusively on MSA's general policy of forwarding corre-

_____

[3] An "inference" is a common evidentiary device which allows the trier of fact to draw "a logical deduction or conclusion from established fact." United States v. Grow, 394 F.2d 182, 199 (4th Cir. 1968). That is, an inference permits the jury to find an ultimate fact to have been proven based upon proof of another fact. The determination of whether an inference is reasonable "cannot be decided in a vacuum; it must be considered in light of the competing inferences to the contrary." Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995) (internal citations omitted).

In Pennsylvania R.R. Co. v. Chamberlain, 288 U.S. 333 (1931), the Supreme Court concluded that it is "not permissible [to infer the existence of a particular fact] in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses consistent with the facts actually proved, from which testimony it affirmatively appears that the facts sought to be inferred did not exist." Id. at 341. Similarly, in Ford Motor Co. v. McDavid, 259 F.2d 261 (4th Cir. 1958), we explored the jury's ability to draw inferences from established facts, writing:

> [I]t is the province of the jury to resolve conflicting inferences from circumstantial evidence. Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture.

Id. at 266.

14

spondence to Moag -- that MSA sent the shield drawing to Moag's law office. I disagree on this point; the majority's inference-upon-inference determination that Moag received Bouchat's shield drawing is much too speculative to support a finding of access. See Selle, 741 F.2d at 902.

Indeed, the only evidence produced at trial on this issue is inconsistent with the jury's inference that the faxed drawing reached Moag. The office manager at Patton Boggs testified that an investigation of internal office files did not indicate receipt of any drawings from Bouchat. Likewise, when Moag was asked whether he recalled receiving any artistic submissions from Bouchat after their initial meeting, he replied, "No, I do not. I remember meeting Mr. Bouchat but I don't remember receiving anything from him." J.A. 966.

Although it is within the province of the jury to evaluate the credibility of these witnesses, the jury cannot:

> arbitrarily discredit a witness and disregard his testimony in the absence of any equivocation, confusion, or aberration in it. It is not proper to submit uncontradicted testimony to a jury for the sole purpose of giving the jury the opportunity to nullify it by discrediting the witness, when nothing more than mere interest in the case exists upon which to discredit such witness.

M.H. Thomas & Co. v. Hawthorne, 245 S.W. 966, 972 (Tex. Civ. App. 1922) (quoted with approval in Chesapeake & O. Ry. Co. v. Martin, 283 U.S. 209, 219-20 (1931)). See also Browning v. Crouse, 356 F.2d 178, 180 (10th Cir. 1966); Eaton v. National Broad. Co., 972 F. Supp. 1019, 1024 (Ed. Va. 1997), aff'd, No. 97-2162, 1998 WL 258381 (4th Cir. May 21, 1998) (per curiam). As the Seventh Circuit recognized in Selle, "the testimony of credible witnesses concerning a matter within their knowledge cannot be rejected without some impeachment, contradiction or inconsistency with other evidence on the particular point at issue." 741 F.2d at 903 (citations omitted).

In the face of the uncontradicted evidence that Bouchat's shield drawing was not received at Moag's law office, MSA's general prac-

15

tice of forwarding correspondence to Moag, standing alone, is simply insufficient to support a jury finding that the drawing actually reached Moag's office. In short, the majority's second inference (Step 2) -- that MSA forwarded the drawing to Moag's office-- amounts to nothing more than "mere speculation, conjecture, or a bare possibility of access." See Selle, 741 F.2d at 902.

C.

Furthermore, assuming the jury could permissibly find that the shield drawing reached Moag's office (Step 2), Bouchat's proof of access is even less convincing in the succeeding two steps. After the drawing reached Moag's law office, Step 3 in the access analysis is premised on another inference -- that the fax was then sent to Modell of the Ravens organization. In this regard, the majority infers access based on another thin reed -- the mere fact that the Ravens rented temporary office space from Moag's law firm: "By proving that the drawings were transmitted to Moag, and that Modell shared the same office space with Moag, Bouchat proved that Modell had `access' to Bouchat's drawing." Ante at 5.

Once again, however, Bouchat produced no evidence to corroborate his contention that Modell received the shield drawing. Instead, Bouchat asks us to infer -- based on his testimony that he sent a fax of the drawing to MSA -- that MSA received it; infer further -- based on MSA's policy of forwarding correspondence addressed to Moag to Moag's law office -- that the drawing was sent to Patton Boggs; and then infer even further -- based on the fact that the Ravens rented office space from Patton Boggs -- that Modell received the drawing. While the majority regards an office policy as sufficient proof that MSA forwarded the fax to Moag, it ignores Moag's personal policy and practice to the contrary of not forwarding to the Ravens material sent to MSA. This error directly conflicts with both common sense and numerous authorities to the contrary. Corporate receipt of the material alleged to be infringed is simply insufficient proof of access in the face of uncontroverted evidence that corporate policy was to separate these sorts of submissions from the alleged infringers. See Grubb v. National Football League Properties, 901 F. Supp. 36, 39 (D. Mass. 1995); Vantage Point, Inc. v. Parker Bros., Inc., 529 F. Supp. 1204 (E.D.N.Y. 1981).

16

Furthermore, the evidence at trial is consistent with Moag's policy of not forwarding material to the Ravens. The undisputed evidence was that neither Modell nor any other Ravens official ever received Bouchat's shield drawing. As the district court conceded, "There is no direct evidence specifically proving that the Shield Drawing fax was provided to Mr. Modell, and he generally denies any knowledge of such a fax." J.A. 1313.

There is more. All witnesses from the Ravens organization categorically denied having received or viewed Bouchat's shield drawing prior to creation of the Ravens shield logo. Modell himself testified unequivocally that he never received any Bouchat drawings. Likewise, David Cope, the Ravens vice-president for marketing (and the official responsible for handling outside submissions during the months of March and April 1996), testified that he did not see any drawings submitted by Bouchat. Although juries are generally entitled to disbelieve the testimony of any witness, "the testimony of credible witnesses concerning a matter within their knowledge cannot be rejected without some impeachment, contradiction or inconsistency with other evidence on the particular point at issue." Selle, 741 F.2d at 903 (citations omitted). Again, the inference that Modell received the shield drawing cannot fairly be characterized as anything other than "mere speculation, conjecture, or a bare possibility of access."

D.

Nonetheless, even if we also assume that Modell received Bouchat's shield drawing (Step 3), such a conclusion still leaves the drawing nearly 200 miles south of the NFLP's New York office. To establish access, Bouchat bore the additional burden of proving Step 4 -- that Kim and Osaki, the NFLP's creators of the allegedly infringing work, had a reasonable opportunity to view or to copy his shield drawing. See Towler, 76 F.3d at 582; see also Eaton, 972 F. Supp. at 1024 n.7 (E.D. Va. 1997) ("Proof of access is only probative of copying to the extent that the alleged copier had access to the protected work. Thus, it is access by the creators of the allegedly infringing work that must be shown.").

1.

Significantly, the majority does not discuss whether Kim and Osaki had a reasonable opportunity to view or copy Bouchat's shield draw-

17

ing. The majority's analysis on this point is a single sentence, concluding simply, "The jury was entitled to infer that the NFL designers had access if a third party intermediary (Modell) with a close relationship to the alleged infringers (the NFL designers) had access." Ante at 5. Under this so-called "third party intermediary doctrine," courts may "infer that the alleged infringer had a reasonable possibility of access if the author sent the copyrighted work to a third party intermediary who has a close relationship with the infringer." Towler, 76 F.3d at 583.

The problem with this point is simple -- the inference is rebutted by uncontradicted testimony. Inferring access under this doctrine, like any inference, must be a reasonable deduction from established fact. See Grow, 394 F.2d at 199. The defendants introduced undisputed evidence inconsistent with the majority's inference that Modell shared the drawings with someone at the NFLP. For instance, Mr. Cope testified that the Ravens did not forward any materials or drawings to the NFLP after March 18, 1996, approximately two weeks prior to Bouchat's claimed date of access.[4] Similarly, the undisputed evidence indicates that Bouchat's shield drawing was not received by the NFLP in New York. Bruce Burke, the NFLP's vice president and creative director, when asked whether he saw any of Bouchat's drawings prior to the final selection of the Ravens logos, testified simply, "No, absolutely not." J.A. 864. Similarly, Paula Guibault, the NFLP's senior intellectual property counsel, when asked whether she had seen any of Bouchat's drawings prior to the initiation of this lawsuit, replied, "No, I did not." J.A. 1053. And finally, both Kim and Osaki, the NFLP artists responsible for the design of the Ravens shield logo, tes-

_____

[4] In finding the evidence sufficient to support the jury's finding of access, the district court relied largely on evidence "that at least on two occasions in the pertinent time period, unsolicited sketches were sent by Mr. David Modell to NFLP." J.A. 1314. However, both of these submissions were forwarded to the NFLP prior to the Ravens's institution of a no-forwarding policy on March 18, 1996. By contrast, as Cope's undisputed testimony indicated, the policy was in effect when Bouchat allegedly faxed his shield drawing on April 1, 1996. Therefore, the district court's suggestion that unsolicited sketches were forwarded to the NFLP during "the pertinent time period" is inaccurate.

18

tified unequivocally that they had never seen any drawings submitted by Bouchat.**5**

Given the complete absence of evidence that Bouchat's shield drawing was received in the NFLP's New York office, the inference that the NFLP designers had access to the drawing is the result of an illogical and impermissible series of inferences. Although the old rule that disallowed the piling of inference upon inference has been abrogated, such pilings must be "well supported by the evidence. We must . . . tak[e] into consideration that its probability may be attenuated by each underlying inference." Cora Pub, Inc. v. Continental Cas. Co., 619 F.2d 482, 486 (5th Cir. 1980). In this case, the endless piling of unsupported and contradicted inference upon inference upon inference rises to the level of absurdity.

2.

In the copyright context, a special requirement of access has been established to prevent exactly the sort of problem this case presents. Other federal courts, perhaps after seeing a dizzying array of meritless copyright claims, have offered insight into the problem. In Meta-Film Assocs. v. MCA, Inc., 586 F. Supp. 1346 (C.D. Cal. 1984), for example, the court rejected a claim of infringement over an unsolicited script sent to a movie studio that eventually produced the movie "Animal House." In doing so it observed that "[i]n such a business [film production], countless unsolicited scripts are submitted to numbers of individuals on studio lots every day. Under these circumstances, it is clearly unreasonable to attribute the knowledge of any one individual . . . to every other individual just because they occupy offices on the same studio lot."

The New York federal courts have frequently dealt with instances of a plaintiff coming forward with a "bare corporate receipt," alleging that he or she sent unsolicited material to various well-known compa-

_____

**5** Kim and Osaki were initially contradicted by Bouchat's "expert," who testified that it was a "fact[ ]" that Asians -- Kim and Osaki are presumably of Asian descent -- are "taught in their culture" to copy. J.A. at 160. Three weeks after that improper testimony, the court instructed the jury to disregard it.

19

nies. The plaintiff later sues when a similar work is produced. These decisions have been steadfast in holding that access cannot be permissibly inferred from such "bare corporate receipt." See Dimmie v. Carey, 88 F. Supp. 2d 142, 146-49 (S.D.N.Y. 2000) (rejecting claim of infringement on Mariah Carey song where plaintiff alleged sending tape to Columbia Records, then theorized Carey's eventual access by a "series of uncertain inferences" not unlike those offered by Bouchat); Tisi v. Patrick, 97 F. Supp. 2d 539, 547-48 (S.D.N.Y. 2000) (rejection of "bare corporate receipt" as proof of access under similar facts); Cox v. Abrams, 1997 WL 251532 (S.D.N.Y. May 14, 1997) (unpublished); Novak v. National Broad. Co., 752 F. Supp. 164 (S.D.N.Y. 1990).

Indeed, this is not the first time the NFL has been alleged -- on unsupported facts -- to have infringed other artistic work in creating a design. See Grubb v. National Football League Properties, Inc., 901 F. Supp. 36, 39 (D. Mass. 1995) (refusing to "discredit the testimony" of numerous defense witnesses, responsible for the production of a new logo for the New England Patriots, that they had never seen the plaintiff's proposed logo, when the plaintiff had "not shown any evidence" of access).

The facts here resound of those above. These cases typically involve similar litigation over successful movies, books, songs or other artistic works. Inevitably, a plaintiff comes forward claiming to have thought of the idea first -- only to have no evidence, except for having sent his or her work to a corporation or person affiliated with the alleged infringer.[6] While some also have proof that somebody read their work, many do not.[7] But where the proof is extraordinarily

_____

[6] Indeed, Dimmie, supra, involved the second plaintiff to bring a claim of infringement against Mariah Carey over the song "Hero." An earlier case, described by the court as a "complete fabrication," was also dismissed. See Selletti v. Carey, 177 F.R.D. 189, 193 (S.D.N.Y. 1998).

[7] At least two recent cases have indicated that the lack of "concrete evidence" of actual receipt "such as a postage receipt or an entry in . . . submission log[s]" can be dispositive of a claim of access based merely on corporate receipt. See Tomasini v. Walt Disney Company, 84 F. Supp. 2d 516, 520 (S.D.N.Y. 2000); Dimmie, 88 F. Supp. 2d at 146 (S.D.N.Y. 2000).

20

thin and based on a chain of unsupported and fanciful inferences, the courts have rightfully found the access requirement unmet. In stark contrast to this insight, the majority dismantles the access requirement by allowing a tenuous, unproved, contradicted, and inconsistent chain of inferences to satisfy <u>Towler</u> and prove access. This guts the entire purpose of the access requirement, and it will inevitably lead to further jury verdicts ad absurdum.

IV.

After incorrectly concluding that Bouchat had met his burden of showing access under <u>Towler</u>, the majority unnecessarily adopts a new legal principle -- the "strikingly similar" doctrine.**8** The majority concludes that, even if the plaintiff had not met the burden of showing access, the "striking similarity [between the plaintiff's original work and the alleged infringing work] is one way to demonstrate access." <u>Ante</u> at 7. That is, based on the striking similarity between Bouchat's shield drawing and the Ravens shield logo, Bouchat is entitled to an inference that the defendants had a reasonable opportunity to view and thereby copy his work.

A.

This is an interlocutory appeal under the provisions of 28 U.S.C. § 1292(b). The issues presented are: (1) Was the plaintiff's proof of a reasonable possibility of access legally insufficient? (2) <u>If so</u>, will

_____

**8** The majority concedes that we have never adopted the "strikingly similar" doctrine. In the only case in which we have addressed this issue on the merits, albeit in an unpublished decision, we expressly rejected the adoption of the doctrine. <u>See Takeall v. Pepsico, Inc.</u>, No. 93-1237, 1993 WL 509876 (4th Cir. Dec. 8, 1993). In <u>Takeall</u>, the plaintiff urged us to adopt a "per se rule regarding the elimination of the need for proof of access in cases involving `striking similarity.'" <u>Id.</u> at *4. Relying on the Second Circuit's decision in <u>Gaste v. Kaiserman</u>, we observed that while "striking similarity alone can raise an inference of copying, that inference must be reasonable in light of all the evidence." 1993 WL 509876, at *5 (quoting <u>Gaste</u>, 863 F.2d at 1068). Accordingly, we rejected the plaintiff's arguments, concluding that adoption of such a per se rule would be "inadvisable and unsupported by law." <u>Id.</u>

21

the Fourth Circuit adopt the `strikingly similar' doctrine inferring access as expressed in <u>Gaste v. Kaiserman</u>, 863 F.2d 1061, 1068 (2d Cir. 1988)?" J.A. 1328-29 (emphasis added). After holding that the plaintiff's proof of access <u>was not</u> insufficient, the majority had no reason to answer the second question. It does so nevertheless and, in my view, does so incorrectly.**9**

Relying on <u>Gaste</u> and the Seventh Circuit's decision in <u>Selle v. Gibb</u>, the majority adopts the "strikingly similar" doctrine, which holds that "striking similarity is circumstantial evidence of copying, thereby supporting an inference of access." <u>Id.</u> In <u>Gaste</u>, the Second Circuit described the contours of the doctrine as follows:

> Though striking similarity alone can raise an inference of copying, that inference <u>must be reasonable in light of all the evidence</u>. A plaintiff has not proved striking similarity sufficient to sustain a finding of copying if the evidence as a whole does not preclude any reasonable possibility of independent creation.

<u>Gaste</u>, 863 F.2d at 1068 (emphasis added).

Similarly, the Seventh Circuit in <u>Selle</u> recognized that striking similarity does not completely eliminate the need for additional proof of access:

> [S]triking similarity is just one piece of circumstantial evidence tending to show access and must not be considered in isolation; it must be considered together with other types of circumstantial evidence relating to access. As a threshold matter, therefore, it would appear that there must be at least some other evidence which would establish a reasonable possibility that the complaining work was available to the alleged infringer. . . . The plaintiff must always present sufficient evidence to support a reasonable possibility of access because the jury cannot draw an inference of access based upon speculation and conjecture alone.

_____
**9** The majority's adoption of the"strikingly similar" doctrine is unnecessary dicta, and should accordingly lack precedential value.

22

741 F.2d at 901. Based on <u>Gaste</u> and <u>Selle</u>, the majority maintains that Bouchat is entitled to an inference of access because of the striking similarity between the Ravens shield logo and his shield drawing.

B.

I am unable to join in the majority's endorsement of the "strikingly similar" doctrine. The doctrine's underlying assumption is that where two works are so strikingly similar, there is a high probability that one was copied from the other. <u>See Gaste</u>, 863 F.3d at 1067-68. However, this assumption, standing alone, runs contrary to a fundamental principle of copyright protection: independent creation. <u>See Feist</u>, 499 U.S. at 345 (recognizing that "originality," the sine qua non of copyright protection, requires independent creation and some degree of creativity). Evidence of copying -- access plus substantial similarity -- is "crucial to any claim of copyright infringement because no matter how similar the two works may be (even to the point of identity), if the defendant did not copy the accused work, there is no infringement." 741 F.2d at 901 (citation omitted). Indeed, "two works may be identical in every detail, but, if the alleged infringer created the accused work independently or both works were copied from a common source in the public domain, then there is no infringement." <u>Id.</u> As Judge Learned Hand observed in <u>Sheldon v. Metro-Goldwyn Pictures Corp.</u>, 81 F.2d 49 (2d Cir. 1936), <u>aff'd</u>, 309 U.S. 390, 392 (1940), "[I]f by some magic a man who had never known it were to compose anew Keats's Ode on a Grecian Urn, he would be an `author,' and, if he copyrighted it, others might not copy that poem, though they might of course copy Keats's." <u>Id.</u> at 54.

However, under the majority's "strikingly similar" doctrine, one who <u>plagiarized</u> Keats's Ode on a Grecian Urn in 1820 would arguably be entitled to an inference of infringement-- based merely on the similarity of the two works -- against one of England's greatest poets. Such an absurd result illustrates why the requirement of proving substantial similarity should remain independent of the requirement of demonstrating access -- Keats's poem is "strikingly similar" to the hypothetical plaintiff's poem because the plaintiff <u>copied</u> it from him.10 Simply put, in examining a plaintiff's circumstantial evidence of copying, proof of one element should not allow a court to infer the existence of the other.

---

10 The panel majority has affixed to its opinion Bouchat's shield drawing and the Ravens logo, apparently to illustrate their "striking similarity" to each other. It strikes me that these drawings better illustrate the point made in the Keats' hypothetical. In fact, it is just as likely that Bouchat copied the Ravens' logo as vice versa. It bears repeating, <u>see</u> <u>supra</u> note 1, that Bouchat did not copyright his shield drawing until nearly two months after the Ravens unveiled their logo.

V.

For the foregoing reasons, I have concluded that the jury's verdict in favor of Bouchat is unsupported both factually and legally, and I respectfully dissent.

24