## In re MOUNTAIN LAUREL RESOURCES COMPANY, Debtor.

## Lewis Law and Mining Management, Inc., Appellants,

v.

## Roy V. Wolfe, III, Trustee, et al., Appellees.

No. CIV.A. 5:00–0610, Bankruptcy No. 93–50398. Adversary No. 96–0125.

United States District Court, S.D. West Virginia, Beckley Division.

Feb. 16, 2001.

Charles E. Hurt, Charleston, WV, for Lewis Law and Mining Management, Inc.

Richard E. Rowe, Suzanne Jett Trowbridge, Goodwin & Goodwin, Charleston, WV, for CSX Minerals, Inc. and CSX Transportation, Inc.

Scott Oostdyk, McGuire, Woods, Battle & Boothe, Richmond, VA, for CSX Corporation, Inc.

Stephen L. Thompson, Barth, Thompson & George, Charleston, WV, for Roy V. Wolfe, III.

Mark J. Rudolph, Deputy Chief, Office of Legal Services, Division of Environmental Protection, Charleston, WV, for State of West Virginia.

Travers R. Harrington, Jr., Fayetteville, WV, for Town of Fayetteville.

John A. Rollins, Lewis, Friedberg, Glasser, Casey & Rollins, Charleston, WV, Meryl R. Leiberman, Traub, Eglin, Lieberman, Straus, Hawthorne, NY, for Camden Fire Insurance Association.

Michael B. Victorson, Jackson & Kelly, Charleston, WV, Paul Farquason, Michele Oshman, Semmes, Bowen & Semmes,

Baltimore, MD, for Federal Insurance Company.

Michele Grinberg, Flaherty, Sensabaugh & Bonasso, Charleston, WV, Kevin M. Murphy, Anthony S. Cox, Caron, McCormick, Gordon & Constants, Dallas, TX, for Fireman's Fund Insurance Company.

Lawrence E. Carr, Jr., Carr, Goodson, Lee & Warner, Washington, DC, Thomas S. Sweeney, MacCorkle, Lavender & Casey, P.L.L.C., Charleston, WV, for Continental Insurance Company.

David M. Pollack, John R. Siegart, Melito & Adolfsen, New York City, Mark W. Browning, Roberta F. Green, Shuman, Annand, Bailey, Wyant & Earles, Charleston, WV, for Twin City Fire Insurance Company and First State Insurance Company.

Arden J. Curry, II, Thomas H. Vanderford, IV, Pauley, Curry, Sturgeon & Vanderford, Charleston, WV, A. Kelly Turner, Daniel I. Schlessinger, Lord, Bissell & Brook, Chicago, IL, for American Empire Surplus Lines Insurance Company.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

Pending is the appeal by Lewis Law (Law) and Mining Management, Inc. (MMI)[1] of a final judgment of the bankruptcy court denying their motion to proceed to trial against CSX Minerals and the CSX Entities. Because the Court finds the bankruptcy court properly interpreted its own order, the judgment below is **AFFIRMED**.

1. Law is the sole shareholder of MMI.

2. An accumulation of coal mine waste on the surface of a mine site.

3. The deed provided MMI assumed "any and all liability, present and future, ... for all environmental and safety matters, including but not limited to, air pollution [and] water pollution ... arising out of the ownership or use of the property conveyed, which includes

## I. FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises from complex litigation spanning almost two decades concerning the environmental cleanup of a 241-acre site in Fayette County, West Virginia known as Summerlee. Prior to 1980, Summerlee was owned by the New River Company. New River was owned by Western Pocahontas Company, which was later purchased by the CSX Corporation and its subsidiaries (collectively the CSX entities). New River's name was later changed to Mountain Laurel Resources Company (Mountain Laurel).

Summerlee contained a "gob pile"[2] approximately one hundred feet deep, spread over a substantial portion of the site. Water percolating through the gob pile accumulated contaminants known as acid mine drainage (AMD). In 1978 the State of West Virginia (the State) required Mountain Laurel to install a treatment plant to treat and mitigate the AMD. The water treatment system was subject to a National Pollution Discharge Elimination System (NPDES) permit obtained by New River. In 1980 MMI purchased a portion of the surface rights of Summerlee from Mountain Laurel. The sale included a preparation plant, a series of ponds, the gob pile, and the water treatment system.[3] Despite repeated notice, neither MMI nor Law applied for an NPDES permit authorizing AMD discharges. MMI and Law failed to operate the water treatment system effectively, allowing AMD discharges on at least sixteen occasions between March 1987 and November 1991.[4]

all possible future claims that may be asserted by ... [State and Federal agencies]."

4. MMI and Law were charged with violating the Clean Water Act, 33 U.S.C. § 1319(c)(2). Following a jury trial, Law was sentenced to two years in prison, and MMI and Law were fined $80,000 each. Both convictions were upheld on appeal. *United States v. Law*, 979 F.2d 977 (4th Cir.1992).

Between 1984 and 1993, the State and the Town of Fayetteville (the Town) filed a series of civil actions in state court against Mountain Laurel, the CSX entities, MMI and Law. The State and Town sought to compel abatement of the water contamination by AMD and damages incident to remedying the pollution. In response, MMI and Law sought indemnification from Mountain Laurel and the CSX entities. MMI and Law also asserted fraud claims against Mountain Laurel and the CSX entities, alleging fraudulent conveyance of the Summerlee property, which prevented MMI and Law from discovering the pollution problems at Summerlee, and caused MMI and Law to incur extensive liability and Law to be imprisoned. The fraud claims were maintained against the CSX entities as the ostensible alter ego of Mountain Laurel. In 1995 the state court entered judgment in favor of the State against MMI and Law as to liability, but damages were not assessed because of ongoing settlement discussions in the instant action.

In 1993 Mountain Laurel filed for Chapter 11 bankruptcy protection.[5] Based on the ongoing state court litigation in which Mountain Laurel was still a defendant, the State, the Town, MMI, and Law filed proofs of claim against Mountain Laurel, asserting rights to its bankruptcy estate. In response, the Trustee initiated an adversary proceeding seeking a declaration of rights under certain insurance policies as to Mountain Laurel's coverage and its right to recover its defense costs in defending the state court litigation.

The State, the Town, MMI and Law were permitted to intervene as plaintiffs against the insurers, and sought determination of the insurers' liability and each party's rights to the proceeds, if any, from the insurance policies. The Trustee then engaged in extensive negotiations in an effort to resolve the various, interlocking disputes among the parties to the adversary proceedings, the bankruptcy claims, and the state court litigation. Although not involved in the adversary or bankruptcy proceedings, the CSX entities, defendants in the state court litigation, voluntarily participated in the settlement discussions.[6] MMI and Law refused to participate in settlement negotiations.

After several months, the Trustee proposed a settlement and compromise acceptable to all parties except MMI and Law. Under terms of the proposed settlement, the insurers and the CSX entities would pay to the Environmental Claim Fund of the estate a total of eight hundred fifty thousand dollars ($850,000). Of that total, the estate would retain one hundred thousand ($100,000) for fees and costs expended in the state court litigation as well as payment of other claims and administrative expenses of the estate. The remaining seven hundred fifty thousand ($750,000) would be paid to the State and the Town in full satisfaction of their environmental claims against the estate, Law, MMI, and the CSX entities. MMI and Law would receive relief from the state court judgment already entered in favor of the State for the costs of remediating Summerlee. Further, MMI and Law were to be released from similar claims of the Town, indemnity claims of the estate, and indemnity, contribution, and subrogation claims of the insurers and CSX entities, should the latter be called upon to satisfy the claims of the estate and then look to MMI and Law.

All parties signed the settlement agreement, except MMI and Law who refused, and objected to the settling parties' motion to approve the agreement. Following an evidentiary hearing on the motion, on February 10, 1999 the bankruptcy court issued a settlement order approving the settlement agreement.

5. The bankruptcy was later converted to Chapter 7.

6. Citizen groups of riparian landowners along Wolf Creek, representatives of the National Park Service, and the federal Office of Surface Mining, also non-parties, participated as well.

Law and MMI appealed the bankruptcy court's approval of the Settlement Agreement. This Court dismissed the appeal, based upon equitable mootness. *See Law v. Wolfe (In re Mountain Laurel Resources Co.)*, No. 5:99–0180 (S.D.W.Va. June 9, 1999) (Chambers, J.). Because Law and MMI failed to move for a stay of the settlement order, the Court found "compliance with the Agreement has progressed beyond the point in which this Court could reverse the process without adversely affecting the rights of third parties and the parties who have fulfilled their responsibilities under the plan." *Id.* at 10. Our Court of Appeals affirmed the District Court dismissal in an unpublished decision. *Mine Management, Inc. v. Wolfe (In re Mountain Laurel Resources Co.)*, 210 F.3d 361, 2000 WL 341913 (4th Cir.2000).

Discussing the settlement order, the Appeals Court stated, "With respect to MMI and Law's fraud claims against Mountain Laurel, the bankruptcy court determined that those claims were still viable but that MMI and Law would have to assert them against the estate in bankruptcy court if, at a later time, it was determined that there were funds available for distribution to general unsecured creditors." *Id.* at *7. A footnote to this observation stated:

> The bankruptcy court's order does not make reference to the status of MMI and Law's fraud claim against the CSX entities. However, the court's interpretation of the settlement agreement as not affecting the viability of MMI and Law's fraud claims against Mountain Laurel appears to indicate that MMI and Law's fraud claims against the CSX entities may still be viable in the bankruptcy court.

*Id.*, n. 8 (Footnote Eight).

On the basis of this footnote, MMI and Law moved the bankruptcy court to allow them to proceed to trial against the CSX entities. The bankruptcy court denied the motion and ordered the adversary proceeding closed. MMI and Law now appeal this ruling. The Court affirms.

## II. DISCUSSION

### A. Jurisdiction and Standard of Review

Jurisdiction is proper in this Court under 28 U.S.C. § 158(a)(1) as an appeal of a final judgment of the bankruptcy court.

■ On appeal a district court may not set aside a finding of fact made by the bankruptcy court unless it is clearly erroneous. Fed. R. Bankr.P. 8013. Review of the bankruptcy court's conclusions of law is *de novo. See In re Johnson*, 960 F.2d 396, 399 (4th Cir.1992).

### B. The Court of Appeals' Interpretation of the Settlement Order

■ The Court of Appeals held: 1) the bankruptcy court had jurisdiction and authority to enjoin, by way of enforcement of the settlement agreement, MMI and Law's claims against the parties to the settlement agreement, in particular, the CSX entities, *Mine Management*, 2000 WL 341913 at *11, and 2) MMI and Law's challenge to the merits of the bankruptcy court's settlement order was equitably moot.[7] *Id.* at *12.

Relying on Footnote Eight of the Appeals Court's discussion of the settlement order, Appellants urge that "the Fourth Circuit interpreted the settlement agreement as allowing the fraud claims of MMI and Law against the CSX entities to proceed in the bankruptcy court as an adversary proceeding." Thus, they claim, the bankruptcy court clearly erred in holding otherwise.

---

7. Appellants present extensive evidence and argument, which ostensibly supports their fraud claims against Mountain Laurel and the CSX entities. The underlying questions of the merits of the fraud claims and whether the bankruptcy court should have allowed them to proceed are not before this Court. MMI and Law's challenges to the merits of the settlement order are equitably moot. *Mine Management*, 2000 WL 341913 at *11.

█ The purported authority, on which the Appellants rely, appears in *Mine Management,* an unpublished opinion, which is not binding precedent in the Fourth Circuit. Dicta are "statement[s] in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it." *Pittston Co. v. United States,* 199 F.3d 694 (4th Cir.1999) (quoting *United States v. Crawley,* 837 F.2d 291, 292 (7th Cir.1988) (internal quotation marks omitted)) (other citations omitted). Dicta are without precedential value. *See Bouchat v. Baltimore Ravens,* 241 F.3d 350, 364 n. 9 (4th Cir.2001).

The Appeals Court's passing reference to the CSX-fraud claims is dicta, irrelevant to the court's holding and peripheral to the discussion, as shown by its footnoted position. Further, the putative "interpretation" is mere speculation about what the bankruptcy court might have meant, and tentative speculation at best: "bankruptcy court's interpretation ... *appears to indicate* claims against the CSX entities *may* still be viable." (Emphasis added.) Footnote Eight, dicta in an unpublished opinion, provides no binding interpretation of the meaning of the settlement order, and no order or direction to the bankruptcy court or this Court.

In contrast to dicta relied on by Appellants, the bankruptcy court's interpretation relies on the Appeals Court's holding. The Appeals Court held, because MMI and Law "consented to the bankruptcy court's authority to determine the issues" in the adversary proceeding, the bankruptcy court had authority to determine the validity of their claims and rights to indemnification from the estate. *Mine Management,* 2000 WL 341913 at *11. Further,

> [a] determination of the validity of MMI and Law's indemnification claims necessarily requires the bankruptcy court to evaluate the merits of all the parties' claims. Thus, *the bankruptcy court had*

*little choice but to exercise its authority over the entire state court litigation, including MMI and Law's alter ego claim against the CSX entities.*

*Id.* (emphasis added). Finally, the Appeals Court held that "the bankruptcy court had authority to enjoin MMI and Law's claims against the parties to the settlement agreement." *Id.*

In sum, the Appeals Court concluded the bankruptcy court had authority 1) to determine the issues in the adversary proceeding, which necessarily included the merits of MMI and Law's claim against CSX, and 2) to enjoin MMI and Law's claims against the CSX entities, a party to the settlement agreement.

## C. The Bankruptcy Court's Interpretation of the Settlement Order

The bankruptcy court re-employed its authority, ascertained by our Court of Appeals, when it denied MMI and Law's motion to proceed to trial against the CSX entities, stating:

> It was always, and remains, this Court's intention that the settlement agreement approved by this Court over objection of [MMI and Law] resolved all pending claims between the parties, including all fraud claims [MMI and Law] may have had against the CSX entities. To hold otherwise would be to effectively cause the destruction of the settlement agreement.

*Wolfe v. Continental Ins. Co. (In re Mountain Laurel Resources Co.),* Bankruptcy Case No. 93–50398, slip op. at 2 (S.D.W.Va. May 23, 2000). With regard to Footnote Eight, the bankruptcy court explained, "This Court believes that the Fourth Circuit did not have access to the entire record of these proceedings, and was thereby not fully informed of the facts of this case and the totality of this Court's February [10], 1999 ruling." *Id.*

█ A bankruptcy court's interpretation of its own order enjoys "customary appellate deference." *Colonial Auto Cen-*

*ter v. Tomlin,* 105 F.3d 933, 941 (4th Cir. 1997). The bankruptcy court is "in the best position to interpret its own orders." *Id.* (quoting *Texas N.W. Ry. Co v. Atchison, Topeka and Santa Fe Ry. Co. (In re Chicago, Rock Island & Pac. R.R. Co.)* 860 F.2d 267, 272 (7th Cir.1988)). Because a bankruptcy court was directly engaged in the earlier proceedings, it had a better vantage point to make a determination on its earlier order. *See id.* A bankruptcy judge who has presided over a case from its inception is also "in the best position to clarify any apparent inconsistencies in the court's rulings." *Id.* (quoting *Ranch House of Orange–Brevard, Inc. v. Gluckstern (In re Ranch House of Orange–Brevard, Inc.),* 773 F.2d 1166, 1168 (11th Cir. 1985)). Although interpretation of the settlement order essentially presents a question of law, an appellate court should give substantial deference to the bankruptcy court's analysis of its own order. *Id.*

■ The Mountain Laurel bankruptcy action was assigned to Judge Pearson at its inception in 1993 and he has overseen it and the adversary proceeding. Having been directly engaged in this complex proceeding, Judge Pearson was thus the best judge to determine the meaning and intent of his original settlement order.

Before accepting the settlement agreement, Judge Pearson conducted an extensive evidentiary hearing. He heard testimony about the difficulty of the lengthy settlement negotiations, pollution exclusions that might have prevented the insurance companies from paying anything at all, the substantial costs of completed land reclamation and ongoing water remediation for which indemnification might be sought, and the settling parties' concerns for environmental cleanup. Judge Pearson did not hear evidence from MMI and Law. After the bankruptcy court ruled the claims of the State and Town were postpetition administrative claims of higher priority than MMI and Law's pre-petition unsecured claims, Law and MMI declined to adduce evidence.

Examination of the settlement order demonstrates the bankruptcy court's interpretation of its order is reasonable in light of the history of the litigation and the settlement agreement. In the settlement order, the bankruptcy court predicted the unlikelihood of estate funds to pay general unsecured creditors, like the MMI and Law. Unlike claims of the State and Town, the MMI/Law claims, based on common law fraud and intentional tort, were excluded from coverage under the insurance policies paying into the estate fund.

Despite MMI and Law's potential inability to collect from the estate or the insurance companies, the bankruptcy court found the proposed settlement had value to Law and MMI. Because it relieved them of the state court judgment, they would not be liable for the State cleanup and ongoing water treatment expenses. Likewise, Law and MMI were relieved of similar claims from the Town in the amount of $480,000, the indemnity claims of the estate, and indemnity, contribution, and subrogation claims of the insurers and the CSX entities. Given the likely absence of funds for distribution to general unsecured creditors, the bankruptcy court found no prejudice in treating the MMI/Law claim against the estate as resolved by channeling it to these releases. The bankruptcy court declined to estimate the amount of the claim, but provided,

> In the event it is later determined that there may be funds available for distribution to [general unsecured] creditors, the Court will, upon request, estimate or otherwise determine the amount of such claim and allow it to receive such distribution as it may be entitled to receive under the Bankruptcy Code.

*Wolfe v. Continental (In re Mountain Laurel),* Bankr.No. 93–50398, slip op. at ¶ 26 (S.D.W.Va. Feb. 10, 1999).

Considering all these factors, the bankruptcy court concluded, "the settlement provides for a distribution to Law and MMI upon their Claim which exceeds that

which they could be expected to receive from the Trustee from the assets of the Estate upon a final distribution." *Id.* ¶ 25. The court found the proposed settlement was "a comprehensive, sophisticated and intensely negotiated plan for the orderly liquidation of the Debtor's assets, including its causes of action against others, and the distribution of all the Debtor's assets to its creditors." *Id.* ¶ 27.

To protect the integrity of the settlement, the bankruptcy court permanently enjoined "any person from attempting to pursue any of the claims released by the terms of the Settlement Agreement [8] or from interfering, in any respect, with the implementation of the terms of the Settlement Agreement." *Id.* ¶ 30.

In summary, Law and MMI propose the bankruptcy court misinterpreted the Agreement or misapplied the Appeals Court's Footnote Eight when it extended the injunction to their fraud claim against the CSX entities. To the extent the settlement order may have "appeared to indicate" otherwise, the Order of May 23, 2000 clearly expresses:

> All claims between the parties were resolved by the order of February [10], 1999, and [MMI and Law] are enjoined from further pursuit of claims related to this real estate transaction against the debtor, the CSX entities or any other party to the settlement agreement.

**8.** Law and MMI object the Settlement Agreement was crafted to enjoin only "environmental claims;" their fraud claim is not an environmental claim; it should not be barred by the bankruptcy court injunction. "Environmental claim" is a defined term in the settlement agreement, meaning:

> any Claim brought by any entity, whether public or private ... relating to an alleged threatened or actual ... contamination of the environment.... Environmental Claim expressly includes without limitation any Claim related to coal, coal dust, coal fines, coal by-products, coal ore, gob piles, acid mine drainage, ... water pollution, mining effluent, and mining byproducts.

### III. CONCLUSION

The Court **AFFIRMS** the ruling of the bankruptcy court denying Appellants' motion to proceed to trial against the CSX entities and denying their request for a jury trial as moot.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to counsel of record and to the bankruptcy court and to publish it on the Court's website at http://www.wvsd.uscourts.gov.

MMI and Law's claim against the Debtor and the CSX entities alleged fraudulent misrepresentation of the status of Summerlee at the time of sale regarding environmental regulatory compliance, State orders to clean up and treat water for AMD, and potential criminal liability faced by officers of New River for environmental violations. The bankruptcy court correctly found Law and MMI's claims fell within the broad language defining an environmental claim. That is why the settlement order explains that, along with numerous other claims resolved by the settlement, "the *proposed settlement is a resolution of the claims of Law and MMI against* the Estate, the Insurers, and *the CSX entities.*" *Id.* ¶ 18 (emphasis added).