**Bruce Eugene WATKINS, et al., Plaintiffs,**

v.

**CHESAPEAKE CUSTOM HOMES, L.L.C., et al., Defendants.**

**Civ.A. No. RDB–03–89.**

United States District Court, D. Maryland, Southern Division.

Aug. 12, 2004.

Sidney S. Friedman, Joseph M. Gusmano, Weinstock, Friedman and Friedman PA, Baltimore, MD, for Plaintiffs.

Frederick Gilbert Michaud, Law Office of Frederick G. Michaud, Ryan P. Page, Washington, DC, Albert Tramposch, Robert W. DeVos, Burns, Doane, Swecker and Mathis LLP, Alexandria, VA, for Defendants.

## MEMORANDUM OPINION

BENNETT, District Judge.

This is a copyright infringement action that was brought by Plaintiffs, Bruce and Gail Watkins, against Chesapeake Custom Homes, L.L.C. (Chesapeake), its President, Frank Lucente, and its General Manager, Gregory Wilby. Chesapeake is a Maryland home builder with whom Plaintiffs contracted to build a new home. Plaintiffs' infringement claim is based on copyright registrations that they obtained on several sketches and photographs that they claim represent the "B & G Watkins Grand Master Suite" (Grand Master Suite), which is essentially a reconfiguration of the second floor of Chesapeake's standard "Lexington I" model home ("Lexington" or "Lexington model"). Based on the sketches, Chesapeake's architect, Inner Dimensions, modified the existing architectural plans of the Lexington to reflect Plaintiffs' modifications and revisions. The home was built based on the Inner Dimensions plans.

The Watkins applied for copyright registration for their Grand Master Suite after learning that Chesapeake was marketing and building two new home models, the "Lexington II" and "Lexington III." They contend that, in designing these two models, Chesapeake copied Mr. Watkins' design for the Grand Master Suite. Plaintiffs brought the instant action alleging that Chesapeake is infringing their copyrights by continuing to build homes that were based on the infringing design.

Defendants have moved for summary judgment on three bases. First, they contend that the copyright registrations are invalid because Mr. Watkins supplied the United States Copyright Office ("Copyright Office") with false and misleading information. Second, they argue that rearranging several rooms within the existing footprint of a model home does not rise

to the level of originality required by the copyright laws. Finally, Defendants assert that the works are derivative and therefore require the permission of the maker.

In response, Plaintiffs argue that they have satisfied the elements for a prima facie case of copyright infringement, and they attempt to identify several material issues of fact that they contend preclude summary judgment. After the parties had thoroughly briefed the issues, the Court held a hearing on the Defendants' Motion on August 5, 2004. For the reasons that follow, Defendants' Motion for Summary Judgment will be GRANTED.

## I. *Background*

In 1997, the Watkins met with Chesapeake representative Holly Singletary to discuss the purchase of a parcel of land in Chesapeake's Graystone subdivision in Upper Marlboro, Maryland. Plaintiffs initially told Ms. Singletary that they were not interested in purchasing a Chesapeake-constructed home because they wanted a "one-of-a-kind" home that would never be available on the general market. (Bruce E. Watkins Dep. at 27:15–19; 64:18.) She showed the Watkins a "cut sheet" that roughly illustrated the layout of the floor plan of the Lexington model. (*Id.* at 27:20, 28:3.) The cut sheet lacked scale and dimension. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 3 at 2.) The Lexington floor plan featured a second-floor master bedroom suite consisting of the bedroom, a large bathroom, a sitting room, and a walk-in closet. (*Id.*) The floor plan also included a first-floor family room with a cathedral ceiling that extended into the second-floor space. (*Id.*) Mr. Watkins met with Greg Wilby at Chesapeake to see if it would be possible to eliminate the cathedral ceiling and use the space over the family room to enlarge the master bedroom. (Watkins Dep. at 26:4–10.) Prior to meeting with Mr. Wilby, Mr. Watkins had viewed another model home designed by Chesapeake called the "Grandhaven II,"[1] which featured a second-floor master bedroom and master bath over the first floor family room and garage. (*Id.* at 33:19–35:2, 36:1–11.)

At his meeting with Wilby, Mr. Watkins drew a rough sketch to illustrate his proposed "alterations" to the Lexington. (*Id.* at 25:12–26:14.) Wilby testified that he was familiar with that arrangement and believed that it was architecturally-feasible to incorporate Mr. Watkins' ideas because Chesapeake had previously built the "Mullens residence"[2] which had the second floor master bathroom in the front of the house with the master bedroom directly behind it. (Gregory Wilby Dep. at 48:1–16, 116:12–117:9.) Wilby told Mr. Watkins that he would follow-up with him after he checked with Inner Dimensions to make sure that the changes were, in fact, feasible given the design of the Lexington. (Watkins Dep. at 26:17–21.) Mr. Watkins was subsequently informed that Inner Dimensions, as the architect for Chesapeake, had indicated to Chesapeake that the modifications were feasible. (*Id.* at 28:13–29:5.) The parties set a date to execute a contract. (*Id.*)

Mr. and Mrs. Watkins signed the contract for the purchase of the modified Lexington on September 14, 1997. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 7.) Mr. Watkins drew a sketch to illustrate the changes he wanted in the second floor master bedroom suite. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 8.) That sketch was attached to the contract as "Attachment A." (Def.'s Mem. Supp. Mot. Summ. J. Ex. 7 at CCH 0009.) Also inserted in

---

1. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 4 at 11.)

2. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 6 at CCH 0326.)

the contract was the handwritten language "with upper level as modified by purchaser; see Attachment A; attached hereto and made a part hereof." (*Id.* at CCH 0003.) The contract specified that the Watkins were to pay $10,000.00 in addition to the sales price for the modifications requested by Mr. Watkins. (*Id.* at CCH 0011.)

After he signed the contract, Mr. Watkins made additional drawings to illustrate his desired modifications to the second floor of the Lexington. (Def.'s Mem. Supp. Mot. Summ. J. Exs. 9 & 10.) All of Mr. Watkins' drawings up to that point were on 8½ by 11 inch paper, and lacked both dimension and scale. (Watkins Dep. at 44:15–45:11 and 58:1–8.) Mr. Watkins indicated that this was because Chesapeake had not yet built a Lexington model, and it was therefore unable to supply him with the dimensions that he needed to "figure out where things could actually fit." (*Id.* at 42:6–18.) Because the drawings lacked scale and dimension, Mr. Watkins acknowledged that a home could not be built based on his drawings. (*Id.* at 45:7–11.)

The contract was contingent on a tour by the Watkins of a completed Lexington. Mr. Wilby conducted that tour with Mr. Watkins on January 21, 1998, and Addendum 2 to the contract was modified to reflect the satisfaction of that condition. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 7 at CCH 0016.) That same day, the Watkins signed a new addendum specifying additional modifications to the contract. (*Id.* at CCH 0012.) That provision did not change the price of the house but specified

that $2,500.00 of the Watkins' deposit was to be applied to the cost of making architectural drawings for the modified Lexington, and that those monies would not be refundable. (*Id.*) The same provision was also included in an addendum that was signed on March 31, 1998. (*Id.* at CCH 0017–20.) Mr. Watkins was informed that Inner Dimensions was to make the final architectural plans for his new home so that the architect could "make sure it worked, and also to get permits." (Watkins Dep. at 43:14–19.)

Inner Dimensions revised the existing second floor plans for the standard Lexington to reflect the changes requested by Mr. Watkins and titled the revised plan "the Lexington–Watkins Residence" ("Watkins residence"). (Def.'s Mem. Supp. Mot. Summ. J. Ex. 11.) Inner Dimensions had copies of all of Mr. Watkins' 8½ by 11 drawings, and reviewed those drawings before completing the Watkins residence plans. (Def.'s Mem. Supp. Mot. Summ. J. at 5.)

On or about March 1, 1998, after he had reviewed Chesapeake's Watkins residence drawing,[3] Mr. Watkins made a large computer-aided-design ("CAD") drawing[4] which included the second floor of the Lexington partial side view. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 13.) In the hearing before this Court, Plaintiffs' counsel indicated that Mr. Watkins took the "footprint" and dimensions for that drawing directly from Chesapeake's architectural plans. The purpose of the CAD drawing was to demonstrate changes that Mr. Watkins wanted to be made by Chesa-

---

3. (Watkins Dep. at 56:10–20.)

4. The CAD drawing that Mr. Watkins ultimately deposited with the Copyright Office bears the stamp of the United States Department of Justice, Facilities and Administrative Management Services Division. Mr. Watkins testified that he is employed with that Division as a Construction Management Specialist. (Watkins Dep. at 21:13–15.) The fact that the Department of Justice stamp appears on the copyrighted drawing is an apparent oversight, as the document is clearly outside the scope of Mr. Watkins' official duties as an employee of the United States Government.

peake's architect. (*See id.* (containing notations such as "we want an oval shaped tub installed in the master bath," etc.); Watkins Dep. at 57:2–17.)

Chesapeake built the Watkins' Residence using the architectural plans prepared by Inner Dimensions, as modified at Mr. Watkins' request. (Watkins Dep. at 32:12–18.) Thereafter, Mr. Watkins learned that Chesapeake was marketing and building the Lexington II and Lexington III models, which he considered to have the same second floor plan as his house. (*Id.* at 31:21–32:13.) Upon learning of this, Mr. Watkins began the process of seeking copyright protection for his drawings, and he placed copyright notices on his drawings. (*Id.* at 31:11–33:10.)

Mr. Watkins then submitted two applications for copyright registration to the Copyright Office. Both applications for registration were filed as "Derivative Work[s] or Compilation[s]" made with permission of the owner of a preexisting work. Both registrations identify the "preexisting work" referred to in the application as "ARCHITECTURAL DRAWING FROM BUILDER USED WITH PERMISSION." (Pl.'s Compl. Exs. 5 & 6.) Mr. Watkins has testified that the "drawings from builder" phrase makes reference to Chesapeake's architectural plans of the Lexington. (Watkins Dep. at 108:17–21 and 115:4–13.) In these initial applications, Mr. Watkins quite precisely stated that the registered renderings were derivative works used with permission of the builder.[5] Mr. Watkins confirmed in his deposition that his only basis for claiming

permission to copyright derivatives of Chesapeake's Lexington is the sales contract for the purchase of his home. (Watkins Dep. at 63:2–64:3, 109:3–11). The contract contains neither reference to copyrights nor to any rights concerning the architectural plans. (*See generally* Def.'s Mem. Supp. Mot. Summ. J. Ex. 7.)

On March 15, 1999, Mr. Watkins obtained certificates of copyright registration for "technical drawings" (VAu455–924) and "architectural work" (VAu455–925). As required by statute, Mr. Watkins submitted deposits along with the copyright registrations that included the large CAD drawing that Mr. Watkins made after reviewing the architectural plans, the three drawings that he made before the initial Watkins residence plans were completed, and several photographs of the interior and exterior of his completed residence.

On April 8, 1999, Mr. Watkins instructed Chesapeake to cease and desist copying and distributing his drawing and using it to construct new homes. On April 20, 1999, Watkins' counsel advised Chesapeake that Chesapeake was infringing upon Watkins' copyrights and demanded that Chesapeake cease and desist using those works.

On January 10, 2003, Plaintiffs filed the instant action alleging copyright infringement (Count I), promissory estoppel (Count II), unjust enrichment (Count III), and negligent misrepresentation (Count IV). On May 20, 2003, this Court granted Defendants' Motion to Dismiss Counts II, III, and IV of Plaintiffs' Complaint be-

5. The Plaintiffs maintained the position that these renderings were derivative works throughout these proceedings until the conclusion of discovery in this case. On December 2, 2003, Plaintiffs filed an application with the Copyright Office to amend their previous registrations to indicate that the works are "original" as opposed to a derivative work as reflected in the prior registration applications and in the Plaintiffs' Complaint. (Pl.'s Mem. Supp. Mot. Summ. J. Ex. 9.) Plaintiffs' supplemental interrogatory responses state that "if Plaintiffs' works were found to be derivative, Plaintiffs had permission to proceed, because of the contract between Plaintiffs and Defendant Chesapeake Custom Homes." (Def.'s Mem. Supp. Mot. Summ. J. Ex. 18.)

cause those claims were barred by the applicable statute of limitations. The Court also limited Plaintiffs' claims under Count I to the alleged acts of infringement that occurred within three years of the January 10, 2003 filing of Plaintiffs' Complaint. Defendants filed the instant Motion for Summary Judgment on the remaining claims on December 5, 2003.

## II. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no *genuine* issue as to any *material* fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c)(emphasis added). In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court explained that only "facts that might affect the outcome of the suit under the governing law" are *material. Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Moreover, a dispute over a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court further explained that, in considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence supporting a claimed factual dispute exists to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249, 106 S.Ct. 2505. In that context, a court is obligated to consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

However, "[w]hen the moving party has met its responsibility of identifying the basis for its motion, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *White v. Rockingham Radiologists, Ltd.*, 820 F.2d 98, 101 (4th Cir.1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(e)). Thus, Rule 56 mandates summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Similarly, the existence of a mere "scintilla" of evidence in support of the nonmoving party's case is insufficient to preclude an order granting summary judgment. *Id.* at 252, 106 S.Ct. 2505. Furthermore, District courts have an "affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Celotex Corp.*, 477 U.S. at 323–24, 106 S.Ct. 2548).

## III. Analysis

### A. Elements of Copyright Infringement Action

■ To establish a prima facie case of infringement, a plaintiff must first establish the plaintiff owned a valid copyright to the work that was allegedly copied. *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). That determination involves an analysis of whether the plaintiff has a registration certificate, and whether the copyrighted work is sufficiently original to warrant copyright protection. *Id.* Secondly, once the plaintiff establishes ownership and validity, plaintiff must

prove that the defendant copied protected elements of that work. Plaintiffs cannot establish these elements. *Id.*

## B. *Presumption of Validity of Plaintiffs' Copyright*

 Copyright registration is a jurisdictional prerequisite to bringing an action for infringement under the Copyright Act. *Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 283 (4th Cir.2003). A certificate of copyright registration is "prima facie evidence of the validity of the copyright *and of the facts stated in the certificate.*" 17 U.S.C. 410(c) (emphasis supplied). However, this presumption can be rebutted by specific evidence that the information contained in the registration is erroneous. *See Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680, 688 (4th Cir. 1992). The Fourth Circuit has held that the presumption of validity is not destroyed by "accidental but harmless mistakes in a copyright application." *Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350, 357 (4th Cir.2001).

 In this case, Defendants seek to rebut the validity of the copyright registration based on their contention that Plaintiffs supplied the Copyright Office with false and misleading information. Specifically, Defendants argue that Mr. Watkins' assertion that he had the builder's permission was false. Moreover, Defendants submit that the deposits were misleading because they included photographs of the entire house and direct copies of portions of Inner Dimensions' work. Mr. Watkins made no attempt to explain which portions of the deposits included his work, and which portions reflected Inner Dimensions' work. Plaintiffs acknowledge that the classification of Plaintiffs' works as derivative was made in error. However, they contend that a genuine issue of material fact arises as to whether that error was made intentionally. Plaintiffs'

argument suggests that they are protected under the "innocent error rule" applied in *Bouchat*, 241 F.3d at 357. That rule is not applicable in this case. Moreover, Plaintiffs' registrations are not entitled to the presumption of validity for two reasons.

First, Plaintiffs' assertion that his works were based on architectural plans "from builder" "used with permission" is both false and material to the determination of the validity of the copyright. The determination of permission in this case is a legal question. In submissions to this Court and in oral argument at the hearing on the subject Motion, counsel for the Plaintiffs acknowledged that the only basis for Mr. Watkins' claim of permission is the September 14, 1997 agreement with Chesapeake for the sale of the disputed residence. (*See* Def.'s Mem. Supp. Mot. Summ. J. Ex. 18.) This Court has reviewed that entire agreement and all of the addenda and attachments thereto. Nothing in that agreement confers any permission and/or rights concerning the architectural plans explicitly or implicitly. (*See generally* Def.'s Mem. Supp. Mot. Summ. J. Ex. 7.) The agreement is silent as to the plans. (*Id.*) Mr. Watkins' sketch is attached to the agreement merely to clarify the fact that the sales price of the house is "with the upper level as modified by purchaser." (*Id.* at CCH 0003.) Additionally, Mr. Watkins' deposition testimony, the sketches themselves and the overwhelming majority of the evidence in the record confirm that Mr. Watkins made the sketches merely to guide Chesapeake's architect in making revisions to the Lexington plans. *See supra,* at 6.

 There is nothing before this Court that suggests that Chesapeake authorized Mr. Watkins to do anything more than illustrate the modifications that he wanted to be made to Chesapeake's standard plans. Mr. Watkins' participation in the

preparation of the plans confers no ownership interest to Plaintiffs in either the original Lexington plans or the final plans used to construct the Watkins residence. *Cf. M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d 1486, 1493 (11th Cir.1990) (holding that a homeowner who drew sketches and provided significant input into home plans was not a coauthor of architectural plans because "[s]uch involvement by a client in the preparation of architectural plans is normally expected ...")

■ Moreover, there is no material issue as to whether these statements fall within the "innocent error rule." The Fourth Circuit's recent application of that rule in *Bouchat* is illustrative. 241 F.3d at 357. The defendant in that case sought to completely invalidate the plaintiff's copyright registration based on the fact that the plaintiff failed to note that his football logo incorporated the public domain elements of a cross, a shield and the letter "B." *Id.* The court recognized that Bouchat's failure to note the obvious inclusion of such public domain elements was "harmless" and "inadvertent" and thus was an "innocent error" which did not bar plaintiff's infringement action. *Id.* Conversely, Mr. Watkins' statements were factual assertions that were central to the determination of whether his work was entitled to copyright protection in the first instance. As such, the statements are neither "harmless" nor "accidental" and are therefore not protected under the innocent error rule. *See Bouchat,* 241 F.3d at 357.

■ Plaintiffs contend that there is a factual question as to whether Chesapeake has a valid copyright on the underlying plans, and that the lack of permission is not fatal to their claim. The issue of permission is material to Plaintiffs' claim of copyright protection independent of the question of any copyright held by Chesapeake. *See* 17 U.S.C. § 103(a) (providing

that "copyright protection does not extend to any part of the work in which [preexisting] material has been used unlawfully."), and *Pickett v. Prince,* 52 F.Supp.2d 893, 907 (N.D.Ill.1999) (applying § 103(a) to recognize that a derivative copyright that is based upon a *copyrighted* work requires the authorization of the copyright owner in order to be "lawful" and thus valid). Copyright protection for a derivative work only extends to that portion of the work which constitutes the author's original additions to the underlying work. *See Feist,* 499 U.S. at 348, 111 S.Ct. 1282 ("copyright protection may extend only to those components of a work that are original to the author"). To properly determine the scope of Mr. Watkins' copyright, the Copyright Office needed to determine whether Mr. Watkins had the right to use the underlying works, or whether his copyright should only extend to those portions of the plans that he independently authored. *See id.*

■ The second reason that Plaintiffs' copyright registrations are not entitled to the presumption of validity is because Plaintiffs themselves have cast doubts upon the soundness of the registrations. Just before the close of discovery in this case, Plaintiffs reinvented their infringement case by asserting that Mr. Watkins' works were "original" rather than "derivative." Though Plaintiffs have provided the Court with no amended registrations, they also assert that they have filed amendments to the registrations to so indicate. This eleventh-hour effort by Plaintiffs cannot rescue their copyright infringement claim.

■ Upon a review of the submissions and undisputed facts of this case and the arguments of counsel at the hearing on the subject Motion, this Court is compelled to conclude that Plaintiffs' works are derivative, because they were "based upon one or

more preexisting works." *See* 17 U.S.C. § 101. Mr. Watkins first indicated that he had used the builder's plans to make his sketches in the registration statements. Plaintiffs reaffirmed this position in their Complaint. In addition, Mr. Watkins testified at his deposition that he used the Lexington plan to make each of his drawings and that he copied substantial portions of the plans in each of his sketches. (Watkins Dep. at 25:12–26:14, 56:10–20) A cursory comparison of the Plaintiffs' sketches to the Lexington plans reveals that the majority of the elements appearing in the sketch (dimensions, room shapes, etc.) were copied directly from the Lexington plans. Given these facts, the Court finds Plaintiffs' sudden assertion of an "original copyright" is not supported by facts and is therefore unavailing.

What is more, Plaintiffs' attempts to alter the nature of their copyright registration creates doubts about the validity of the derivative copyright registrations that remain before the Court. Plaintiffs claim that the amendment of the registrations was necessary because Mr. Watkins' classification of the works as derivative was based on a misapprehension of the law. That position does not account for the factual assertions made by Mr. Watkins in the applications. Mr. Watkins made three factual assertions in the copyright applications: (1) that the sketches were based on the builder's plans; (2) that the builder gave permission to make the works; and (3) that the works constituted "changes" to various elements of the builder's plans. None of these factual assertions are subject to legal interpretation. Mr. Watkins does not dispute the fact that he made the assertions. In direct conflict with those assertions, however, Plaintiffs now contend that the works were not influenced by the builder's plans at all. By disputing the very facts on which the copyright applications were based, Plaintiffs have themselves destroyed the presumption of "the validity of the copyright *and of the facts stated in the certificate.*" *See* 17 U.S.C. 410(c).

## C. Determination of the Validity of Plaintiffs' Copyright

 Because the presumption of validity has been rebutted, the Court examines the validity of the copyright anew. *See Xoom, Inc.,* 323 F.3d at 283. To qualify for copyright protection, the changes to the underlying work must constitute more than a minimal contribution. *Feist,* 499 U.S. at 348, 111 S.Ct. 1282. The requirement is satisfied if the new material has a "faint trace of originality" and if it provides a "distinguishable variation" from the underlying work. *M. Kramer Mfg. Co., Inc. v. Andrews,* 783 F.2d 421, 438 (4th Cir.1986) (internal citations omitted). In addition, the new material must have been created independently by the author of the derivative work. *See Feist,* 499 U.S. at 345, 111 S.Ct. 1282.

 Plaintiffs' derivative works fail to satisfy these minimal standards. Mr. Watkins' works are neither "distinguishable variations" to the Lexington plans, nor were they "independently created." Instead, Mr. Watkins' works were merely a succession of revisions that he intended to be incorporated into the architectural plans. As previously noted, it is well-settled that a homeowner obtains no rights to an architectural plan even though the homeowner prepared sketches to illustrate revisions to the plans. *See M.G.B. Homes, Inc. v. Ameron Homes, Inc.,* 903 F.2d 1486, 1493 (11th Cir.1990). Plaintiffs seek to escape this difficulty by introducing the draft drawings that Mr. Watkins admittedly prepared for the sole purpose of illustrating his proposed changes to the architectural plans.

As mere revisions, the drawings are not distinguishable variations from the works

on which they are based. The two sketches Mr. Watkins prepared before reviewing his home plans follow the precise format of the "cut sheet" for the Lexington model with which Chesapeake had supplied him. Mr. Watkins acknowledged that his drawings lacked dimension and scale because Chesapeake never supplied him with that information. (Watkins Dep. at 44:15–45:11, 58:1–8.) He also acknowledged that one could not construct a home based on the sketches because of the lack of dimension and/or scale. (*Id.* at 45:7–11.) Moreover, the only variation between the cut sheets and the sketches was a "rough" rendering of how Mr. Watkins proposed to rearrange the existing master bedroom suite given the additional space that would be created by removing the cathedral ceiling. Based on these facts, the sketches do not present a distinguishable variation from the plans on which they are based. *See Towle Mfg. Co. v. Godinger Silver Art Co.,* 612 F.Supp. 986 (S.D.N.Y.1985) (holding that the plaintiff's rearrangement of existing elements of a design did not constitute a distinguishable variation from the underlying work).

■ Furthermore, the CAD drawing that Mr. Watkins prepared after reviewing the architect's drawing was not a distinguishable variation from the plans prepared by the architect. In fact, that drawing is nearly identical to Inner Dimensions' architectural plan for the Watkins residence. Mr. Watkins simply cannot claim that he created this drawing independently. *See Feist,* 499 U.S. at 345, 111 S.Ct. 1282; *Burrow–Giles Lithographic Co. v. Sarony,* 111 U.S. 53, 58, 4 S.Ct. 279, 28 L.Ed. 349 (1884) (recognizing that the author of a work that is nearly identical to the original work is not an "author" because he has not produced anything that

"owes its origin to him."). Mr. Watkins testified that the CAD drawing was mainly drawn from the architect's plans because the drawing was intended to provide Chesapeake with a list of corrections to the architect's plans. (Watkins Dep. at 57:2–17.) Mr. Watkins spelled out many of those changes in a written list that appears on the picture itself, most of which are unrelated to the Grand Master Suite. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 13.) Taken together, Mr. Watkins' drafts amount to nothing more than editorial revisions which Inner Dimensions incorporated into the plans from which the house was ultimately built.

■ The gravamen of the wrong which Mr. Watkins alleges here seems to be that the Grand Master Suite was his idea and that it should therefore be protected from copying. Yet copyright may be claimed only in the "expression" of a work of authorship, and not in its idea. *Whelan Assoc., Inc. v. Jaslow Dental Lab., Inc.,* 797 F.2d 1222, 1234 (3d Cir.1986), *cert. denied,* 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987). Even viewing the facts in a light most favorable to Plaintiffs, the facts before this Court lead to the inescapable conclusion that the "expression" of the Grand Master Suite idea[6] was Chesapeake's architectural drawings of the Watkins residence.

Accordingly, Plaintiffs' copyright registrations are invalid, and Plaintiffs have failed to satisfy the statutory prerequisites for bringing a copyright infringement action. *Xoom, Inc. v. Imageline, Inc.,* 323 F.3d 279, 283 (4th Cir.2003).

### D. *Copying*

■ In the alternative, apart from the invalidity of the copyright, this Court

---

**6.** To the extent that such an "idea" was original enough to warrant copyright protection in the first place.

finds that the Plaintiffs have failed to establish the element of copying in their claim. To demonstrate "actionable infringement" or copying, Plaintiffs must show that Defendants had access to the protected works and that the allegedly infringing work is "substantially similar" to the protected work. *Comins v. Discovery Communications, Inc.*, 200 F.Supp.2d 512, 517 (D.Md.2002). Evidence of substantial similarity and access presents a prima facie case of copying. *See id.* However, that presumption is rebutted where the defendant presents evidence that the allegedly infringing work was "independently created." *Keeler Brass Co. v. Cont'l Brass Co.*, 862 F.2d 1063, 1066 (4th Cir.1988). This is true even if the infringing work is "practically identical" to the copyrighted work. *Id.* The independent creation defense is not an affirmative defense, therefore the burden of persuasion remains on the plaintiff, who must rebut the evidence. *See id.*

The evidence is undisputed that Chesapeake had prepared drawings of the Mullens' Residence"[7] and the Grandhaven II[8] prior to any interaction with Mr. Watkins and the construction of his residence. These drawings reflect the same design features as the allegedly infringing Lexington II and III homes. Defendants have submitted unrebutted evidence that any allegedly infringing drawings were created independently of Mr. Watkins' design. On this precise question of copying, Plaintiffs failed to produce any evidence in response either in their pleadings or at the hearing before this Court. As a consequence, Plaintiffs have failed to sustain their burden to resist summary judgment. *See Bouchat v. Balt. Ravens Football Club*, 346 F.3d 514, 526 (4th Cir.2003) (noting that a party can "survive [a] motion for summary judgment only by adducing specific, nonspeculative evidence...."); *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985) ("[W]holly speculative assertions will not suffice [to avoid summary judgment]."); *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985) (observing that "mere speculation or building one inference on another" is insufficient to overcome a motion for summary judgment).

## IV. *CONCLUSION*

For the reasons set forth above, the Court will GRANT Defendants' Motion for Summary Judgment. An appropriate Order follows.

### *ORDER AND JUDGMENT*

Upon consideration of Defendants' Motion for Summary Judgment (Paper 30), Plaintiffs' opposition thereto, documents submitted in connection therewith, oral argument at a hearing before this Court, and for the reasons stated in the foregoing Memorandum Opinion, IT IS this 12th day of August 2004, hereby ORDERED:

1. That Defendant's Motion for Summary Judgment is GRANTED as to Plaintiffs' sole remaining claim (Count One of Plaintiffs' Complaint);

2. That judgment be ENTERED in favor of Defendants against Plaintiffs with respect to Count One;

3. That The Clerk Of The Court Transmit Copies Of This Order And Accompanying Memorandum Opinion To Counsel For The Parties.

---

7. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 6 at CCH 0326.)

8. (Def.'s Mem. Supp. Mot. Summ. J. Ex. 4 at 11.) Defendants also introduced testimony that revealed that Mr. Watkins toured a completed model of the Grandhaven II prior to making any of his drawings. (Watkins Dep. at 33:19–35:2, 36:1–11.)